*This opinion is subject to revision before final publication in the Pacific Reporter*

**2020 UT 65**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

MICHAEL STRICKLAN,
*Appellant.*

No. 20180944
Heard February 12, 2020
Filed: October 15, 2020

On Direct Appeal

Third District, Salt Lake
The Honorable Elizabeth A. Hruby-Mills
No. 171902781

Attorneys:

Sean D. Reyes, Att'y Gen., Jeffrey D. Mann, Asst. Solic. Gen.,
Kristin L. Zimmerman, Salt Lake City, for appellee

Troy L. Booher, J. Frederic Voros, Jr., Salt Lake City,
Freyja R. Johnson, North Salt Lake, for appellant

JUSTICE PEARCE authored the opinion of the Court in which
ASSOCIATE CHIEF JUSTICE LEE and JUSTICE PETERSEN joined.

CHIEF JUSTICE DURRANT authored a dissenting opinion in which
JUSTICE HIMONAS joined.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1 A jury convicted Michael Stricklan of two counts of aggravated sexual abuse of his ten-year-old stepdaughter (E.D.). Stricklan appeals the district court's denial of a motion for a directed verdict and a motion to arrest judgment. In both motions, Stricklan

argued that the State had produced insufficient evidence to convict him because, by trial, E.D. had recanted her story that Stricklan had inappropriately touched her. Instead, E.D. testified before the jury that she had lied on the two occasions she told a police detective that Stricklan had touched her chest and backside while she was in her bedroom.

¶2 The primary question we need to resolve is whether E.D.'s recantation meant, as Stricklan argues, that our case law dictates that there was insufficient evidence of guilt to dispel reasonable doubt. We conclude that the jury was entitled to weigh the two versions of E.D.'s story, consider the other evidence of Stricklan's guilt, and decide which version of E.D.'s story it found to be credible. The district court did not err in concluding that there was sufficient evidence to sustain Stricklan's convictions. We affirm.

## BACKGROUND[1]

¶3 On the night of Stricklan's birthday, Stricklan, E.D., and E.D.'s mother (Mother) went to dinner to celebrate. Upon returning, E.D. got ready for bed, told Mother and Stricklan goodnight, and went to her room to sleep.

¶4 The events that followed form the basis of this appeal. E.D. provided two different accounts of what happened after she went to bed that evening, and below we explain what the jury heard about each account. But common to both versions is that sometime in the early morning, E.D. spoke to Mother, which led to Mother questioning Stricklan, and Stricklan calling the police.[2]

---

[1] We limit our analysis to only those facts and testimony the jury heard at trial. So "we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 8 n.3, 372 P.3d 629 (citation omitted) (internal quotation marks omitted). "And where the jury returns a verdict that is reasonably sustained by circumstantial evidence and the inferences drawn from it, we must uphold the jury's verdict." *State v. Nielsen*, 2014 UT 10, ¶ 47, 326 P.3d 645.

[2] The jury heard testimony from Officer Hulse, Officer Dallof, and Detective Timpson. Stricklan's father and E.D. also testified. E.D.'s mother invoked spousal communications privilege and did not testify at trial.

¶5 Officer Hulse testified that police dispatch sent her and Detective Holdaway to investigate a possible sexual abuse case.[3] When Hulse arrived at the home around 5:00 a.m., she observed that Stricklan appeared intoxicated. Hulse spoke to Mother and E.D. in Mother's bedroom. Hulse spoke mainly to Mother. Both Mother and E.D. appeared upset and looked as though they had been crying. Hulse testified that Mother appeared "like she had been crying for a while; she appeared very upset." She also noted that E.D.'s face "was kind of swollen like she had been crying and was kind of still crying as she was sitting there." Hulse did not interview Stricklan.

¶6 Officer Dallof replaced Hulse around 5:30 a.m. Dallof testified that Detective Holdaway arrived at the residence around 6:40 or 7:00 a.m. and interviewed E.D.[4] E.D. told the detective that Stricklan had touched her on the "boobs and the butt."

¶7 Detective Holdaway also interviewed Stricklan. According to Dallof, Stricklan told Holdaway he was watching television when Mother came out and confronted him. Stricklan told Holdaway that Mother said to him that E.D. had told her that he had touched E.D. When Holdaway asked why E.D. would say Stricklan touched her, Stricklan replied something to the effect of, "I don't know why." Holdaway also asked Stricklan if he had gone into E.D.'s room. Stricklan said he had entered to turn off the light and the television. Stricklan not only denied touching E.D. inappropriately, but also denied that he had touched her at all.

¶8 Holdaway explained the investigation process to Stricklan and advised him to leave the home and stay elsewhere while the investigation proceeded. Dallof testified he heard Stricklan then call someone on the phone and say that he needed a ride because he "acted inappropriately and I need you to come and pick me up," or

---

[3] The preliminary hearing transcript records the officer's name as Hulse, and when asked to spell her name, the officer spells Hulse. But at trial, the officer's name is listed as Holst. We opt to go with the preliminary hearing's orthography.

[4] Detective Holdaway passed away shortly after the incident. Portions of his reports and interviews were introduced at trial through the testimony of other officers.

"I acted inappropriately, I can't stay here, I need you to come and pick me up."[5]

¶9 The jury also heard E.D. testify that she and Mother went to the Children's Justice Center (CJC). During the CJC interview, E.D. told the detective that Stricklan had touched her "right at the bottom" and on her "boobs."

¶10 A few days after the incident, Stricklan voluntarily went to the police station to talk to Holdaway. Stricklan told Holdaway that E.D. had never lied to him. Stricklan said that he did not think E.D. was making anything up. Stricklan also indicated he did not have "any recollection" of what happened that night. He indicated he did not remember turning off E.D.'s television or light or going into her room at all.

¶11 Detective Timpson testified there was some concern that Stricklan was either impaired or intoxicated during the initial interview on the night of the incident.[6] But at the time of the follow up interview, Stricklan indicated he was sober and had just come back from an Alcoholics Anonymous meeting.

¶12 Stricklan then discussed the events of the night of the incident and admitted that he had been drinking. Stricklan indicated that he remembered watching television and then "his wife coming out yelling at him and waking him up."

¶13 At trial, E.D. testified that what she told Holdaway at the CJC was a lie. E.D. testified that Stricklan did not touch her. E.D. explained that she woke up during the night because her television was off, and she was used to sleeping with the sound on. She testified that when she woke up, she saw Stricklan on the floor and went to tell Mother. E.D. testified Mother got up and asked Stricklan what he was doing. According to E.D., Stricklan responded that he did not know, "got scared and so that's when he told, called the cops on himself."

---

[5] At trial, Stricklan's father testified he received a call from Stricklan the morning of the incident. He indicated his son sounded impaired or like he "had been drinking a lot" and that Stricklan told him he had been "accused of improper behavior."

[6] Timpson reviewed Holdaway's recordings of the interviews with E.D. and Stricklan and testified about those interviews based on his review.

¶14 The State reminded E.D. that she had previously given another reason why she woke up that night. When asked about her prior statements to Holdaway, E.D. did not want to testify and tried to invoke her Fifth Amendment right. The court recessed so E.D. could watch a portion of the video of her CJC interview outside the presence of the jury.

¶15 After watching the video, E.D. was again asked about her prior statements to Holdaway during the CJC interview.

> Q: Did that refresh your recollection of what you told the detective?
> A: Yes.
> Q: Can you tell me what you told the detective?
> A: That he touched me and stuff and that is a lie because I was so scared because I thought I was going to get in trouble and then my mom was going to get in trouble. So yeah.
> Q: Tell me what you told the detective.
> A: That he touched me right at the bottom.
> . . . .
> Q: Okay. And did you tell the detective that it was over the clothes, under the clothes, or something else?
> A: That part I don't remember.
> Q: Okay. So touched your bottom and what else did you tell the detective about where [Stricklan] touched you?
> A: On the back and the chest area.
> Q: Okay. Do you have another word for chest area so I understand what you mean?
> . . . .
> A: My boobs? I don't know.
> Q: Okay. Is that the right word, boobs? Is that what you told the detective indicating where he touched you?
> A: Yes, uh-huh (affirmative).

¶16 E.D. also testified that she could not remember what she told Holdaway about how she had awakened that night. When responding to defense counsel's questioning, E.D. indicated she could not remember what she told Holdaway the day of the incident or at the CJC because she "couldn't remember what [she] made up." E.D. confirmed that she had twice told the police that she was "touched on the boobs and the butt"—once when Holdaway came the night of the incident and once at the CJC interview.

¶17 E.D. said that she told Holdaway a lie because she was scared. E.D. offered that "nothing happened" that night. And when questioned by defense counsel, E.D. testified she was "100 percent sure" that Stricklan did not touch her and that there was "no doubt in her mind." E.D. also testified that nobody had pressured, threatened, or promised her anything to say Stricklan did not touch her. When asked, "Are you saying that [Stricklan] didn't touch your boobs or your butt because that is 100 percent the truth?" E.D. responded, "Yes."

¶18 E.D. also confirmed testimony she had given at Stricklan's preliminary hearing in which she indicated she has had an "experience when [she wakes] up and being half awake that [she] sometime[s] say[s] crazy and untrue stuff." When asked by defense counsel, E.D. confirmed that "when [she] woke up [she] had one of those crazy and untrue moments in which [she] believe[d] that [Stricklan] had touched" her. E.D. further testified she was afraid when she "told the police the lie" at the CJC and was "afraid that [she] and [her] mother were going to get in trouble."

¶19 E.D. testified that when she finally "spoke[] out the truth, now I don't feel like I'm going to get in trouble anymore." And she later testified, "No, I said it didn't happen, so . . . that's the truth, it didn't happen."

¶20 The State asked E.D. about the change in her story. The State focused on what life had been like after Stricklan left. E.D. testified that the house was quiet. She said that she, Mother, and her grandparents all missed Stricklan. E.D. also testified that Mother cried "a whole bunch of times" after Stricklan's departure. E.D. stated she sees Stricklan "as [her] own father, [she] treats him as [her] own father."

¶21 Stricklan did not testify at trial. But the jury heard testimony regarding Stricklan's interview with Holdaway a few days after the incident. Two portions of the recorded interview between Holdaway and Stricklan were played for the jury.

> Q: Well, has, has she ever lied to you, your daughter?
> A: E.D.?
> Q: E.D.
> A: Never.
> Q: Okay. So do you think she's making this up?
> A: No.
> Q: You just don't remember how that happened?

A: I don't have any recollection of it, sir. I'm telling you the truth. I have no idea.
Q: Okay.

¶22 The jury also watched the following exchange between Holdaway and Stricklan:

Q: Do you remember turning off or turning on E.D.'s tv?
A: No, (inaudible).
Q: Or light or anything? So you don't? You don't remember going into her room at all?
A: No, I do not.

¶23 Timpson also testified concerning some inconsistencies in Stricklan's accounts. At various times, Stricklan told Holdaway: (1) that he did not remember going into E.D.'s room or turning off her light; (2) that he did not go into her room; and (3) that he did not remember whether or not he went into her room. Timpson further testified that Stricklan indicated E.D. was asleep in her room and that around eleven p.m. or midnight Mother also went to bed. Stricklan indicated he was watching television and "the next thing he remembered was his wife coming out yelling at him and waking him up" about "the allegations."

¶24 At the close of the State's case, Stricklan moved for a directed verdict. Stricklan relied on cases holding that a single, out-of-court and uncorroborated statement cannot sustain a conviction as a matter of law.

¶25 The district court denied Stricklan's motion. The court distinguished the cases Stricklan cited because E.D. "does not deny having made" the out-of-court statements. The district court observed that the evidence the State presented was "not real strong corroboration, but we're looking at circumstantial, other evidence and what law enforcement found when they went to the house with the emotions that were going on, overhearing the statement by defendant on the phone . . . ." The district court found that this circumstantial evidence was enough to permit the case to go to the jury.

¶26 The jury convicted Stricklan of two counts of aggravated sexual abuse of a child. Stricklan moved to arrest judgment. Stricklan again argued the State had not presented evidence to corroborate E.D.'s recanted, out-of-court statement.

¶27 The district court denied this motion. The court noted that it assessed "the evidence viewed in the light most favorable to the

jury's verdict [to] determine if it is sufficiently inconclusive or so inherently improbable that reasonable minds must have entertained a reasonable doubt as to an element." Based on that standard, the district court found there was "corroborating evidence . . . in the totality of what was presented to the jury, in light of that and the witnesses who were here and how the entire trial did turn out" and there was no cause to reverse the jury verdict.

¶28 The district court sentenced Stricklan to fifteen years to life for each count, with the sentences to run concurrently. Stricklan appeals the district court's denial of his motions.

## ISSUES AND STANDARDS OF REVIEW

¶29 The issue before us is whether the district court erred by denying Stricklan's motions for directed verdict and to arrest judgment. Stricklan raises three arguments: (1) there was insufficient evidence to convict because, at trial, E.D. denied the truthfulness of her out-of-court statement and the State failed to produce any evidence to corroborate E.D.'s original account; (2) the State did not produce evidence of Stricklan's intent; and (3) E.D.'s testimony was inherently improbable.

¶30 We review a district court's grant or denial of a motion for directed verdict and to arrest judgment for correctness. *Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 19, 221 P.3d 205; *see also State v. Workman*, 852 P.2d 981, 984 (Utah 1993). A defendant has a "substantial burden on appeal to show that the trial court erred in denying a motion for directed verdict." *State v. Gonzalez*, 2015 UT 10, ¶ 27, 345 P.3d 1168. We will uphold a denial of the motion for directed verdict based on an insufficiency of the evidence claim, "if, when viewed in the light most favorable to the State, 'some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt.'" *Id.* (quoting *State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183). Thus, a defendant seeking a directed verdict must show that, "when viewed in the light most favorable to the State, *no evidence existed* from which a reasonable jury could find beyond a reasonable doubt" that the defendant committed the crime. *Id.* (emphasis added).

¶31 Similarly, we reverse the denial of a motion to arrest judgment only if "the evidence, viewed in the light most favorable to the verdict, is so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element." *State v. Workman*, 852 P.2d 981, 984 (Utah 1993).

¶32 As to the third issue, under *State v. Robbins*, a judge ruling on a motion to arrest judgment has "leeway to determine whether a witness's testimony is so incredible that it could not have supported an essential element of the charge." 2009 UT 23, ¶ 21, 210 P.3d 288. The test is whether the testimony is "inherently improbable." *Id.* ¶ 18. We review an interpretation of the "inherent improbability criteria for correctness." *Id.* ¶ 13.

**ANALYSIS**

¶33 Stricklan first asserts that the district court erred when it denied his motions because the State presented insufficient evidence of his guilt. To prove sexual abuse of a child, the State needed to show that Stricklan "touche[d] the anus, buttocks, pubic area or genitalia of any child, [or] the breast of a female child, . . . with intent to cause substantial emotional or bodily pain to any individual or with the intent to arouse or gratify the sexual desire of any individual." UTAH CODE § 76-5-404.1(2).[7] To prove aggravated sexual abuse, the State had to demonstrate that "the offense was committed by an individual who occupied a position of special trust in relation to the victim." *Id.* § 76-5-404.1(4)(h). A position of special trust is defined to include a stepparent, like Stricklan. *See id.* § 76-5-404.1(1)(c)(xviii).

¶34 Thus, to convict Stricklan of aggravated sexual abuse of a child, the State was required to produce sufficient evidence that Stricklan: (1) touched E.D., a child, on her breast, anus, buttocks, pubic area, or genitalia; with (2) an intent to cause substantial emotional or bodily pain or arouse or gratify sexual desire; and (3) that Stricklan occupied a position of special trust. *See id.* § 76-5-404.1. Stricklan argues the State failed to introduce sufficient evidence that he touched E.D. and that any such touching was performed to cause pain or arouse sexual desire.

¶35 Stricklan's first argument focuses on the effect of E.D.'s recantation of her statements to police that Stricklan had touched her. Stricklan contends that this court has held that a conviction based solely on an uncorroborated out-of-court statement is insufficient evidence to sustain a conviction. *See State v. Webb*, 779 P.2d 1108, 1115 (Utah 1989); *State v. Ramsey*, 782 P.2d 480, 484 (Utah 1989). He posits that the State failed to introduce any corroborating

---

[7] The code defines a child as an individual under the age of fourteen. UTAH CODE § 76-5-404.1(1)(b).

evidence, and any evidence the State did present at trial might corroborate the fact that E.D. made an allegation but fails to corroborate the truth of that allegation.

¶36 Stricklan argues that in two cases, *Webb* and *Ramsey*, we demarcated a bright line rule that a single uncorroborated hearsay statement is insufficient to support a verdict. Stricklan avers the *Webb/Ramsey* rule resolves this appeal.

¶37 The State contends that *Webb* and *Ramsey* are legally and factually distinguishable. The district court agreed with the State and distinguished Stricklan's case from *Ramsey*, reasoning that "in this case the alleged victim does not deny having made those statements." And again in ruling on Stricklan's motion to arrest judgment, the district court proclaimed that "this is not the *Ramsey* case" and found corroborating evidence "in the totality of what was presented to the jury, in light of that and the witnesses who were here and how the entire trial did turn out." Based on this evidence, the district court found no cause to reverse the jury verdict.

¶38 We take a different lesson from the holdings of those opinions. Rather than concentrate on whether this case most resembles *Webb*, *Ramsey*, or one of the cases in which we applied them, we believe it more helpful to explore the development of that case law to understand what considerations inspired us to rule the way we did and how those considerations might apply to the facts of Stricklan's case.

## I. The *Webb/Ramsey* Rule

¶39 The rule Stricklan relies upon emerged from two cases decided within three months of each other. *See State v. Webb*, 779 P.2d 1108 (Utah 1989); *State v. Ramsey*, 782 P.2d 480 (Utah 1989).

¶40 In *Webb*, a jury convicted the defendant of aggravated sexual abuse of his 18-month-old daughter. *Webb*, 779 P.2d at 1108 (Zimmerman, J., writing separately). Webb visited his daughter at his ex-wife's apartment and was alone with the girl while her mother was at work. *Id.* at 1109. That evening, as the mother was lowering the girl into the bath, the child said, "Ow bum." *Id.* The mother then examined the girl's bottom, during which the child said, "Ow bum daddy." *Id.* The mother noticed some redness and swelling. *Id.* The mother took the child to a doctor who observed an anal tear. *Id.* At the doctor's direction, a photograph was taken of the child's bottom. *Id.* The State charged Webb with aggravated sexual abuse. *Id.*

¶41   At trial, the evidence against Webb consisted of the mother's recitation of the child's statements, the photograph, and the opinion of the examining physician that the child had been abused. *Id.*

¶42   Webb introduced the testimony of a pediatric resident who reported that her examination of the girl did not reveal any tears, fissures, or bruising of the anal area. *Id.* The resident opined the girl had not been abused. *Id.* Another pediatrician, who specialized in child sexual abuse, reviewed the girl's medical records, the photograph of the girl's injury, and the treating physician's report. *Id.* He opined that the photograph did not show a fissure or injury. *Id.* The jury convicted Webb, and Webb appealed. *Id.* at 1109–10.

¶43   One justice would have found that the district court erred in admitting the child's statement without finding that the child was "unavailable" for cross-examination and would have remanded to permit the district court to rule on that question. *Id.* at 1114. The *Webb* majority reacted vehemently to that proposed resolution, stating

> [I]t is the view of the Court that there is no point in remanding this case to the trial court to determine whether the child declarant is unavailable, since a remand assumes that defendant can be convicted of the crime charged on the basis of a one-and-a-half-year-old's exclamations, "Ow bum," or "Ow bum daddy." That evidence is not sufficient as a matter of law to support a conviction.

*Id.* at 1115 (majority opinion).

¶44   The majority concluded that it was "beyond credulity" that a person could be convicted based on the out-of-court statement of an 18-month-old. *Id.* The court noted that the child could not speak in sentences nor engage in a coherent conversation. *Id.* According to the court, "[t]he statement 'Ow bum' while being lowered into bath water and her later statement, 'Ow bum daddy,' do not constitute an accusation against defendant of the elements of the crime of child abuse." *Id.* Indeed, the court reasoned that "[t]he child's outcry could have been to elicit help from her daddy, or it could have had several other meanings." *Id.* The court also reasoned that even if this evidence could allow a jury to conclude that Webb had touched the child, it did not speak to any intent to arouse or gratify Webb's sexual desire. *Id.*

¶45   After reciting those evidentiary problems, the court dropped a single sentence for legal support: "The law is that a single

uncorroborated hearsay statement is not substantial evidence and not sufficient to support a verdict." *Id.* And it cited *United States v. Orrico*, 599 F.2d 113, 118 (6th Cir. 1979), for that proposition. *Webb*, 779 P.2d. at 1115. The one-line exposition of the law on this subject conveyed a certainty that may have been undeserved.

¶46 In *Orrico*, the defendant was convicted of fraudulently cashing checks. 599 F.2d at 114. The government alleged that incoming checks were improperly diverted into a separate account used to support a struggling business. *Id.* at 115. And the government alleged that Orrico had authorized a bookkeeper to endorse and deposit checks into that account. *Id.*

¶47 At trial, the bookkeeper did not remember depositing the checks. *Id.* at 115–16. But during the investigation, the bookkeeper had signed a prepared statement, which was introduced at trial as her "past recollection recorded" pursuant to the Federal Rules of Evidence. *Id.* at 115. A single sentence in that statement recited that Orrico had told the bookkeeper to endorse the checks. *Id.* at 115–16.

¶48 Another witness testified that he had deposited a check into the account, and that Orrico was at the bank at the time the witness deposited the check, but he could not remember if Orrico had accompanied him there. *Id.* at 116. He testified he did not remember who told him to deposit the check. *Id.* The government tried to impeach his lack of memory with his prior testimony before a grand jury that Orrico had told him to endorse the check. *Id.*

¶49 In other words, by the time the case reached the jury, the only evidence "of the defendant's involvement, in any way, in the deposit of the two checks, [was] contained in one sentence of [the bookkeeper's] statement." *Id.* at 115–16.

¶50 The Sixth Circuit addressed the sufficiency of the evidence—specifically, the admissibility of the bookkeeper's signed statement and the witness's prior testimony. *Id.* at 116. The court noted that "the statements were offered as substitutes for the testimony which presumably would have been provided if the witness had been able to remember the events." *Id.* at 117. In the end, the court noted that the defendant "was faced with a Government witness who had given wavering, somewhat inconsistent versions of his story in the past and who now professed to remember nothing, so the truth of the matter could be pursued no further." *Id.* The court was concerned that the case focused "on the fact that the central element of the crime with which the defendant was charged was established entirely through the use of out-of-court statements, made

at a time when the defendant had no opportunity to cross-examine the witnesses as to the accuracy of their accusations." *Id.*

¶51 In the course of reversing the conviction, the Sixth Circuit observed, "It is doubtful, however, that in any but the most unusual case, a prior inconsistent statement *alone* will suffice to support a conviction since it is unlikely that a reasonable juror could be convinced beyond a reasonable doubt by such evidence *alone*." *Id.* at 118 (emphases added).[8]

¶52 The *Webb* court took that dicta from *Orrico* and converted it into the statement that "[t]he law is that a single uncorroborated hearsay statement is not substantial evidence and not sufficient to support a verdict." *Webb*, 779 P.2d at 1115. Needless to say, we overstated *Orrico* a bit. We took an observation about the difficulty of proving a case solely with a prior out-of-court statement and declared it to be "the law."[9]

---

[8] It appears the *Orrico* court may have been sensitive to the fact that when Federal Rule of Evidence 801(d)(1)(A) was amended in the 1970s, some were "quick to observe that [use of a prior inconsistent statement as substantive] evidence would likely be insufficient to support a conviction alone." *United States v. Bahe*, 40 F. Supp. 2d 1302, 1309 (D.N.M. 1998).

[9] It is worth noting that the child's statement at issue in *Webb* was admitted under a now-repealed section of the Utah Criminal Code and that it would not be admissible under our current Utah Rule of Evidence 801(d). *See Webb*, 779 P.2d at 1108–09 (Zimmerman, J., writing separately). Admission under the current rule is premised on the declarant's availability for cross-examination. *See* UTAH R. EVID. 801(d)(1)(A) (providing that a statement is not hearsay if "the declarant testifies and is subject to cross-examination about a prior statement, and the statement[] . . . is inconsistent with the declarant's testimony"). The *Webb* majority noted that because of the child's age, "the child cannot be cross-examined on that statement or anything else related to the alleged crime." *Webb*, 779 P.2d at 1115.

Nor would the statement be admissible under Utah Rule of Criminal Procedure 15.5 because that provision requires, among other things, that the statement be recorded. *See* UTAH R. CRIM. P. 15.5(a) (outlining the requirements to admit the previously recorded statement of a child under the age of fourteen concerning sexual or physical abuse).

¶53 Shortly after issuing *Webb*, we were presented with another sexual abuse case where a conviction hung on an out-of-court statement. *See Ramsey*, 782 P.2d at 484. A jury convicted Ramsey of two counts of sexual abuse of a child. *Id.* at 482. For the first count, the State accused Ramsey of causing his son to lie on top of his daughter and put his penis in the girl's vagina as Ramsey watched. *Id.* The State introduced evidence from a social worker who testified that Ramsey's son told him that Ramsey caused the son to get on top of Ramsey's daughter and engage in intercourse. *Id.* at 482–83.

¶54 At trial, the son testified that he had never said that to the social worker. *Id.* The son also denied that he had ever had sexual contact with the girl. *Id.*

¶55 The plurality opinion noted that "the boy's alleged out-of-court statement to [the social worker] is the *only evidence* that supports the conviction" on the charge that the defendant had caused the boy to sexually abuse the girl. *Id.* at 483 (emphasis added). The plurality addressed the question of whether Ramsey's conviction on that charge could be supported *solely* on the boy's unsworn out-of-court statement:

> [W]hen [out-of-court statements are] the only source of support for the central allegations of the charge, especially when the statements barely, if at all, meet the minimal requirements of admissibility, we do not believe that a substantial factual basis as to each element of the crime providing support for a conclusion of guilt beyond reasonable doubt has been offered by the Government.

*Id.* at 484 (alterations in original) (quoting *Orrico*, 599 F.2d at 118). The plurality then stated that "the single out-of-court statement attributed to the boy by [the social worker] was insufficient to support [Ramsey's] conviction" on the charge that Ramsey had caused his son to sexually abuse his daughter. *Id.* at 484. And we reversed. *Id.* at 486.

¶56 We applied the *Webb/Ramsey* language in *State v. Span*, 819 P.2d 329 (Utah 1991). In *Span*, the defendant appealed his conviction for aggravated arson arising out of a suspicious fire that consumed his former girlfriend's house. *Id.* at 330. The State filed charges based upon a witness who told a fire investigator that Span had said "I flamed Barbara's apartment." *Id.* at 333 n.2. At trial, however, that witness testified "that to the best of her recollection [the defendant's] statement was in fact, 'Barbara's apartment is in flames.'" *Id.* The

witness further denied the accuracy of the statement made to the fire investigators about Span admitting to "flaming" the apartment. *Id.*

¶57 In the course of our analysis, we characterized *Ramsey* as standing for the proposition that "an out-of-court statement which is denied at trial by the declarant is insufficient *by itself* to sustain a conviction." *Id.* (quoting *Ramsey*, 782 P.2d at 484) (emphasis added). But we held *Ramsey* did not apply because the State had introduced other evidence of Span's guilt. *Id.* at 332–33. For example, Span was in the vicinity of the fire when it started and had vandalized his ex's car in the aftermath of their breakup. *Id.*

¶58 A couple of years later, we again applied *Ramsey. See State v. Seale*, 853 P.2d 862 (Utah 1993). In *Seale*, the defendant appealed his convictions for rape and aggravated sexual abuse of a child. *Id.* at 865. At trial, one of his victims answered "I don't know" or "I don't remember" to every question about whether Seale had touched her or if she had told anyone that he had touched her. *Id.* at 866. After her testimony, the State played the victim's videotaped interview in which she detailed four instances when Seale had abused her. *Id.* at 867.

¶59 We concluded that the videotaped interview was sufficient evidence to sustain Seale's conviction. *Id.* at 876. We distinguished *Seale* from *Ramsey* by reasoning that the victim did not deny she made the statement nor that the sexual abuse occurred. *Id.* We ultimately concluded that the "jury was fully entitled to weigh the credibility" of the videotaped interview, the victim's testimony on the stand, and the defendant's contradictory testimony, and decide which version of the victim's story to believe. *Id.* We noted that the jury heard testimony that the victim's mother had pressured the victim to change her story and that the jurors could infer that her lack of memory stemmed from that maternal coaxing. *Id.*

¶60 Upon review of our case law, a pattern emerges. Although we speak of *Webb* and *Ramsey* establishing a "rule" that a single uncorroborated, out-of-court statement cannot sustain a conviction, it is a rule that does very little analytical work. In all of the cases Stricklan cites, we do what we always do when a defendant seeks to set aside her conviction arguing insufficient evidence: we review all of the evidence before the jury to see if it dispels reasonable doubt of the defendant's guilt. In other words, the *Webb/Ramsey* rule is more of a *Webb/Ramsey* truism; if the evidence before a jury centers on the out-of-court statement of an 18-month-old child, that will very likely be insufficient to eliminate reasonable doubt of the defendant's guilt. But, where the out-of-court statement is accompanied by additional

persuasive evidence, like the defendant's motive and presence near the scene of the crime in *Span* or the victim's motive to change her testimony in *Seale*, sufficient evidence may exist to uphold the conviction. *See Span*, 819 P.2d at 333; *Seale* 853 P.2d at 876.

¶61 We can take some comfort in the fact that we did not march down this road unaccompanied. Other states adopted a similar *per se* rule that out-of-court statements, on their own, are insufficient to support a conviction. *See, e.g., Baugh v. State*, 961 So. 2d 198, 204 (Fla. 2007) ("As we held in *Green* and reaffirmed in *Beber*, 'a prior inconsistent statement standing alone is insufficient as a matter of law to prove guilt beyond a reasonable doubt.'" (citations omitted)); *State v. Giant*, 37 P.3d 49, 58 (Mont. 2001) ("Rather, in order to create a clear, bright-line rule for trial courts and practitioners, we reaffirm our holdings in *White Water* and in *Gommenginger* that require prior inconsistent statements admitted as substantive evidence of guilt be corroborated in order to sustain a conviction."), *overruled in part on other grounds by State v. Swann*, 160 P.3d 511 (Mont. 2007); *see also Brower v. State*, 728 P.2d 645, 648 (Alaska Ct. App. 1986) (finding the reasoning of *Orrico* persuasive and reversing a conviction because inadequately corroborated retracted grand jury testimony was insufficient to sustain the conviction).

¶62 But that is not a consensus position. A number of courts have been hesitant to adopt such a broad rule and have found prior out-of-court-statements to be sufficient evidence to support a conviction without requiring corroborating evidence, "so long as a witness who makes a prior statement testifies at trial and is subject to cross examination, thereby enabling the finder-of-fact to both hear the witness's explanation for making the prior statement" and weigh the credibility of the "in-court recantation." *Commonwealth v. Brown*, 52 A.3d 1139, 1167 (Pa. 2012). When the recanting witness is available to testify, and the prior statement is otherwise admissible as substantive evidence, these courts appear to see the question as one of witness credibility and permit the trier of fact to decide which version of the story is most credible.

¶63 For example, the California Supreme Court affirmed a conviction for assault with a firearm based in part on out-of-court identifications of two witnesses. *People v. Cuevas*, 906 P.2d 1290, 1304 (Cal. 1995). It overruled prior case law holding that an out-of-court identification is "in all cases insufficient by itself to sustain a conviction and must be corroborated by other evidence linking the defendant to the crime" and concluded that "individually assessing the circumstances of the out-of-court identification to determine

whether it is sufficient to support a criminal conviction . . . should be applied to all out-of-court identifications." *Id.* at 1302.

¶64 In *Cuevas,* two witnesses described and identified the gunman the night of the shooting. *Id.* at 1293. Yet, at trial, one witness denied having seen the shooter or describing the gunman to the police. *Id.* at 1294. And the other witness recanted his identification of the shooter and claimed he had falsely identified the defendant as the shooter as payback for gang related incidents. *Id.* Both witnesses testified they believed it was "wrong to 'rat off' a member of a rival gang." *Id.*

¶65 Police officers testified that the witnesses had given physical descriptions of the shooter and/or had previous contacts with the defendant. *Id.* Another witness testified that as the shooter approached, one of the recanting witnesses exclaimed, "I know that guy. He's from [a rival gang]." *Id.* Evidence was presented that the defendant was a member of the rival gang and that the defendant met the physical descriptions provided by the recanting witnesses. *Id.*

¶66 Cuevas moved for a judgment of acquittal, arguing there was insufficient evidence to convict him, but the trial court denied the motion. *Id.* The California Supreme Court affirmed the conviction and concluded "that the availability of the identifying witness for cross-examination, the opportunity of the defense to present other evidence questioning the reliability of the out-of-court identification and to request appropriate jury instructions, and the requirement that substantial evidence support the conviction" were adequate protections against "the unjust conviction of a defendant solely on the basis of an unreliable out-of-court identification." *Id.* at 1304; *cf. Watkins v. State*, 446 N.E.2d 949, 961 (Ind. 1983) (rejecting the argument that there was insufficient evidence to convict where the witness gave conflicting accounts of defendant's involvement in a shooting and the witness was available for cross-examination); *Brown*, 52 A.3d at 1171 (holding that "criminal convictions which rest only on prior inconsistent statements of witnesses who testify at trial do not constitute a deprivation of a defendant's right to due process of law, as long as the prior inconsistent statements, taken as a whole, establish every element of the offense charged beyond a reasonable doubt, and the finder-of-fact could reasonably have relied upon them in arriving at its decision").

¶67 The common theme among these cases is that an out-of-court statement can be sufficient evidence to dispel reasonable doubt if the witness can be questioned at trial regarding the change

in the witness's story, and the prior statement, if believed, establishes the elements of the charged crime. These courts concluded that when presented with a witness (or witnesses) who gives conflicting versions of events in question, a jury is well-positioned to decide which version best recounts what happened. Indeed, "it is the rightful role of the finder-of-fact to resolve the discrepancy between the out-of-court statement and the recantation." *Brown*, 52 A.3d at 1167; *see also Di Carlo v. United States*, 6 F.2d 364, 368 (2d Cir. 1925) ("The possibility that the jury may accept as the truth the earlier statements in preference to those made upon the stand is indeed real, but we find no difficulty in it. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court.").

¶68 We have not been asked to overrule *Webb* and *Ramsey* and do not reconsider them here. But we note that this case offers a solid example of why we might be tempted to scrub the rule from our jurisprudence. The parties spent a lot of time arguing about whether Stricklan's case resembled *Webb* and *Ramsey*, and that could have pulled our focus from the question we ultimately need to answer: did the State introduce sufficient evidence of Stricklan's guilt? That having been said, even assuming a vibrant *Webb*/*Ramsey* rule, it would only come into play if E.D.'s out-of-court statement was the only evidence of Stricklan's guilt. As we discuss below, it was not.

## II. We Are Not Required to Independently Reweigh the Reliability of Prior Inconsistent Statements When We Assess the Sufficiency of the Evidence

¶69 The dissent reads *Webb* and *Ramsey* to stand for the proposition that "in reviewing the sufficiency of the evidence, an appellate court should assess the reliability of hearsay, even where the hearsay has been admitted into evidence through a judicially or legislatively created exception."[10] *Infra* ¶ 139. It reasons that *Webb*,

---

[10] Utah Rule of Evidence 801(d)(1) states that a declarant's prior statement is deemed to not be hearsay if "[t]he declarant testifies and is subject to cross-examination about a prior statement" and, among other things, the statement "is inconsistent with the declarant's testimony." E.D.'s prior inconsistent statement is not a hearsay statement within the meaning of our rules. *See* UTAH R. EVID. 801(d)(1).

*Ramsey*, and *Orrico* say that "we may weigh the reliability and probative value of hearsay in assessing the sufficiency of the evidence supporting a guilty verdict." *Infra* ¶ 150.

¶70 The dissent claims we "ignore" this principle and are "unwilling[] to second-guess what [we] deem[] was a 'credibility' determination the jury made . . . ." *Infra* ¶ 151. The dissent claims that we suggest we are "unable to weigh the reliability and the probative value of hearsay evidence on appeal," and therefore our reading is "inconsistent with the reasoning in *Webb* and *Ramsey* (and *Orrico*)." *Infra* ¶ 151.

¶71 We do not read the cases this way nor do we suggest that we can never assess the credibility of evidence before the jury.[11] But

---

[11] We recognize that, ordinarily, we "may not reassess credibility or reweigh the evidence, but must resolve conflicts in the evidence in favor of the jury verdict." *State v. Workman*, 852 P.2d 981, 984 (Utah 1993). But we have noted that in some circumstances, when testimony is "inherently improbable," the "reviewing court may evaluate whether the evidence is so inconclusive or inherently improbable that it could not support a finding of guilt beyond a reasonable doubt." *Id.*; *see also State v. Robbins*, 2009 UT 23, ¶¶ 16–19, 210 P.3d 288 (discussing that courts may reconsider witness testimony that is "inherently improbable").

If we decided to carve out an exception to the general rule along the lines that the dissent does here—that is, an exception that would require us to conduct our own independent assessment of the reliability of properly admitted prior inconsistent statements as part of a sufficiency-of-the-evidence review—this would be a departure from our normal practice of affording deference to the trier of fact's credibility determinations.

We should also recognize that this would appear to be an exception that we have not previously recognized. The dissent has not offered anything to support a conclusion that we have actually ever considered and adopted a rule allowing us to replace the jury's view of the reliability of a prior inconsistent statement with our own when evaluating the sufficiency of the evidence. The dissent cites a single justice's concurrence from a 1916 Utah case for the proposition that "appellate courts have nevertheless considered hearsay's 'unreliable character . . . in determining the weight that should be given it.'" *Infra* ¶ 140 (alteration in original) (quoting *Johnson v. Geddes*, 161 P. 910, 917–18 (Utah 1916) (McCarty, J., concurring)). This

(continued ...)

we, unlike the dissent, fall back on the unremarkable proposition that the trier of fact is in a superior position to assess credibility. *See infra* ¶ 113. Despite the dissent's protests, we continue to push back against the suggestion that the rule *Webb* announced is very helpful to an appellate court. And, frankly, the dissent must have some of the same concerns with *Webb* because it reworks *Webb*'s holding.

¶72 The dissent reads *Webb* to make "clear that even where a hearsay statement is deemed admissible through a legally-recognized hearsay exception, we may nevertheless assess the reliability and evidentiary weight of the statement as part of our sufficiency analysis." *Infra* ¶ 148. Even if that were what *Webb* does, that is not what *Webb* says. *Webb* unequivocally states that the "law is that a single uncorroborated hearsay statement is not substantial evidence and not sufficient to support a verdict." *State v. Webb*, 779 P.2d 1108, 1115 (Utah 1989).

¶73 The dissent also disagrees with our statement that any "rule" *Webb* and *Ramsey* may have established only comes into play when there is no other evidence beyond the hearsay statement introduced at trial. *Infra* ¶¶ 152, 158. We say that because that is what *Webb* and *Ramsey* say. *Webb*, 779 P.2d at 1115 (discussing that Webb's "conviction stands *almost entirely* on one out-of-court declaration" and that "a *single* uncorroborated hearsay statement is not substantial evidence and not sufficient to support a verdict" (emphases added)); *State v. Ramsey*, 782 P.2d 480, 483–84 (Utah 1989) (stating that Ramsey's conviction was supported "*solely* by the boy's unsworn out-of-court statement" and "a conviction that is based *entirely on a single*, uncorroborated hearsay out-of-court statement that is denied by the declarant in court under oath cannot stand" (emphases added)). We also say that because that is what this court has said *Webb* and *Ramsey* say. *See, e.g.*, *State v. Span*, 819 P.2d 329, 333 n.2 (Utah 1991) (reasoning that *Ramsey*'s holding "that 'an out-of-court statement which is denied at trial by the declarant is insufficient *by itself* to sustain a conviction'" was not at play because of additional evidence that placed the defendant near the crime (emphasis added)).

¶74 The dissent argues that the *Webb*/*Ramsey* rule must be broader because those cases examined more evidence than just a

_____

is not controlling, and we are not persuaded that we have ever articulated the rule the dissent wants us to apply.

single out-of-court uncorroborated statement. *Infra* ¶ 152. It also contends that a better reading of *Webb*, *Ramsey*, and *Orrico* is that "where a conviction is based entirely or 'almost entirely' on hearsay evidence, we should determine whether other evidence, which 'differs from' the hearsay, 'strengthens or confirms' what the hearsay evidence shows." *Infra* ¶ 164.

¶75 If that is what *Webb* and *Ramsey* actually said, we might agree with the dissent about their application to the evidence the jury heard. But that is not what those cases say. After reviewing the dissent, our problem with *Webb* and *Ramsey* remains the same: those cases pronounced a rule and created a dynamic where parties, like those here, are incentivized to focus their fight on whether the *Webb/Ramsey* rule applies. And that fight can occur to the detriment of reasoned analysis of all of the evidence in front of the jury.

¶76 To further support its determination that we should review the reliability of the out-of-court statement, the dissent points to two cases from other jurisdictions. First, it cites an opinion of the Massachusetts Supreme Court, *Care & Protection of Rebecca*, 643 N.E.2d 26 (Mass. 1994). *Infra* ¶ 140 n.32. The dissent says this case "explain[s] that under 'traditional principles governing the use of hearsay evidence' courts should 'assess the reliability of such evidence in connection with deciding how much weight to accord it.'" *Infra* ¶ 140 n.32. But the Massachusetts Supreme Court was interpreting a specific Massachusetts statute regarding the *admissibility* of hearsay statements made by young victims of sexual abuse. *See Care & Prot. of Rebecca*, 643 N.E.2d at 33 (citing MASS. GEN. LAWS ch. 233, § 83).[12]

¶77 The Massachusetts court held that a person seeking to admit a statement under the statute "may offer the evidence, but implied in the statute is a requirement that a judge assess the reliability of such evidence in connection with deciding how much weight to accord to it." *Id.* In other words, the Massachusetts court inferred a reliability requirement into the statute. And it justified this extra-textual exercise because the requirement would strike "a permissible balance between the competing interests involved in a care and protection case." *Id.* This case does not establish the proposition, as the dissent suggests, that appellate courts are *required* to review the

---

[12] Stricklan has not appealed the admission of E.D.'s prior inconsistent statements.

reliability of prior inconsistent statements when reviewing the sufficiency of the evidence. *See infra* ¶ 139; *cf. infra* ¶ 140, n.32.

¶78 The dissent also cites to the Montana Supreme Court's decision in *State v. Giant*, 37 P.3d 49 (Mont. 2001), *overruled in part on other grounds by State v. Swann*, 160 P.3d 511 (Mont. 2007), to support the assertion that "sufficiency of [the] evidence is completely dependent on its reliability." *Infra* ¶ 145 (quoting *Giant*, 37 P.3d at 56). This overstates *Giant's* holding. The *Giant* court reasoned that the "issue of sufficiency of the evidence when a conviction is based on a prior inconsistent statement *alone* demonstrates that sufficiency is dependent on the reliability of that statement." *Giant*, 37 P.3d at 58 (emphasis added). The *Giant* court did opine, as the dissent observes, that it must gauge the reliability of prior inconsistent statements by assessing whether the prosecution had introduced evidence that corroborated the prior inconsistent statement. *See id.* at 58–59. And it noted that other courts, and other courts' rules of evidence, dealt with the reliability concerns in other ways. *See id.* at 53–58. For example, New Jersey has developed a fifteen-factor test to assess whether a court should admit a prior inconsistent statement as substantive evidence.[13] *See id.* at 57 (citing *State v. Mancine*, 590 A.2d 1107, 1115 (N.J. 1991)).

---

[13] Those 15 factors are:

(1) the declarant's connection to and interest in the matter reported in the out-of-court statement, (2) the person or persons to whom the statement was given, (3) the place and occasion for giving the statement, (4) whether the declarant was then in custody or otherwise the target of investigation, (5) the physical and mental condition of the declarant at the time, (6) the presence or absence of other persons, (7) whether the declarant incriminated himself or sought to exculpate himself by his statement, (8) the extent to which the writing is in the declarant's hand, (9) the presence or absence, and the nature of, any interrogation, (10) whether the offered sound recording or writing contains the entirety, or only a portion of the summary, of the communication, (11) the presence or absence of any motive to fabricate, (12) the presence or absence of any express or implicit pressures[,] inducement[,] or coercion for making the statement,

(continued ...)

¶79 The *Giant* court ultimately concluded that the only corroborating evidence the prosecution had presented was evidence that the defendant had fled the crime scene. *Id.* at 60. Because Montana considers evidence of flight insufficient to support a conviction by itself, the court concluded that evidence of flight was also insufficient evidence to corroborate the prior inconsistent statement. *See id.*

¶80 The *Giant* court reached that conclusion over a dissent that posited that the majority's beef was really with the Montana Rule of Evidence that characterizes prior inconsistent statements as non-hearsay and permits them to be admitted as direct, substantive evidence. *See id.* at 60–62 (Gray, C.J., dissenting). And the two dissenting justices would have sustained the conviction because of the "extent and timing" of the victim's prior statements. *Id.* at 62. The dissenting justices observed that "almost immediately after" the assault, the victim told the physician examining her that the defendant had assaulted her. *Id.* The next day, the victim told other doctors that the defendant assaulted her and she repeated that assertion to police. *Id.* The dissent reasoned that "statements made nearer in time to the incident could be considered by the jury to be more accurate and free from outside influences than those made later." *Id.*

¶81 The *Giant* dissent also examined the quality of the flight evidence, noting that the defendant had cleaned out all of his bank accounts and moved his minor children into a hotel before he allegedly assaulted the victim. *Id.* at 61. The defendant also abandoned the truck he had used to flee. *Id.* The dissent concluded this was sufficient evidence to uphold the conviction, even after the victim recanted at trial her statements that the defendant had assaulted her. *See id.* at 62 ("It is my view that, because they were corroborated by substantial flight evidence, the jury was entitled to weigh [the victim's] prior statements, together with her trial testimony and credibility, and find beyond a reasonable doubt that Giant was the assailant."). In instances where the declarant is

---

> (13) whether the anticipated use of the statement was apparent or made known to the declarant, (14) the inherent believability or lack of believability of the statement, and (15) the presence or absence of corroborating evidence.

*State v. Gross*, 577 A.2d 806, 810 (N.J. 1990) (citation omitted).

available for cross-examination about the change in the statements, the *Giant* dissent's approach resonates with us more than the lead opinion.

¶82 All that having been said, neither *Giant* nor its dissent, nor *Care & Protection of Rebecca*, bind our decision here. Nor are they particularly helpful in illuminating the question at hand: what do *Webb* and *Ramsey* require of a court performing a sufficiency of the evidence review? Even taking the cases the dissent here cites into consideration, we return to our view that *Webb* and *Ramsey* do not materially alter the task we perform when a party challenges the sufficiency of the evidence underlying a conviction. We look at all the evidence before the jury to determine "if, when viewed in the light most favorable to the State, 'some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt.'" *State v. Gonzalez*, 2015 UT 10, ¶ 27, 345 P.3d 1168 (citation omitted). And while we may, in this case, weigh the evidence differently than the dissent, we still look to determine if "evidence existed from which a reasonable jury could find beyond a reasonable doubt" that the defendant committed the crime. *Id.*

### III. The State Placed Sufficient Evidence Before the Jury that Stricklan Touched E.D.

¶83 Because *Webb* and *Ramsey* purport to apply when the only evidence of guilt consists solely of an uncorroborated out-of-court statement, Stricklan argues the State did not present evidence to corroborate E.D.'s out-of-court statement that he inappropriately touched her. Stricklan's framing of the question has the potential to distract from the relevant inquiry. As we have just discussed, when reviewing a challenge to the sufficiency of the evidence, we look at all of the properly admitted evidence before the jury to ensure that the State introduced enough evidence to permit the jury to find guilt beyond a reasonable doubt. E.D.'s prior inconsistent statement was not the only evidence of Stricklan's guilt before the jury.

¶84 Stricklan argues the "totality of the evidence" against him consists of: "(i) the timing of Child's reports; (ii) Child's mother confronting Mr. Stricklan; (iii) an officer testifying that he heard Mr. Stricklan tell his parents on the phone that he needed a ride because he acted inappropriately; (iv) Mr. Stricklan acknowledging that Child had never lied and he did not think Child was making it up; (v) Child's 'vague and nonsensical testimony' at trial; and (vi) Child's testimony that she and her mother were sad and missed Mr. Stricklan." He argues none of this evidence corroborates E.D.'s

initial story and only shows that E.D. made an out-of-court statement and people reacted to it.[14] We disagree with the assertion that this constitutes insufficient evidence to support a conviction.

¶85 The State introduced evidence which, if believed, could permit the jury to conclude beyond a reasonable doubt that Stricklan touched E.D. First, in response to questioning from the State, the jury heard E.D. confirm that when the police arrived on the morning following the incident, she told Detective Holdaway that Stricklan had touched her on the "boobs and the bottom." It also heard E.D. testify that she went to the CJC with Mother and again told Holdaway that Stricklan had touched her "right at the bottom" and on her "back and chest area." E.D. clarified that by "chest area" she meant her "boobs."[15] It also heard Officer Dallof confirm that he overheard Holdaway interviewing Stricklan and that Stricklan "said that he was watching TV when his wife had come out and told him that her daughter said that he touched her."

¶86 E.D. testified that Mother asked Stricklan about what he was doing in E.D.'s room. Officer Hulse testified that when she arrived at

---

[14] The dissent echoes this, saying that "the evidence supporting Mr. Stricklan's conviction amounts to nothing more than an out-of-court statement, . . . and witness testimony regarding how people reacted to this out-of-court statement before it was recanted." *Infra* ¶ 171. Even if this were true, it is not immediately apparent why we would discount Stricklan's statement to the police crediting the allegations E.D. made against him just because that statement was a "reaction" to those allegations. Indeed, an unqualified confession could also be characterized as a reaction to an allegation.

[15] While E.D.'s inability (or perhaps unwillingness) to recall whether she had reported that the touching occurred over or under her clothes may be something to consider when assessing the sufficiency of the evidence, it does not have conclusive legal significance. "[A]ny touching, even if accomplished through clothing, is sufficient to constitute the relevant element of the offense [for] . . . sexual abuse of a child or aggravated sexual abuse of a child" under Utah Code section 76-5-404.1. UTAH CODE § 76-5-407(3)(b); *see also State v. Escamilla-Hernandez*, 2008 UT App 419, ¶ 9 n.3, 198 P.3d 997 ("We note that in cases where the victim is under fourteen years of age, a touching over clothing satisfies the statute." (citations omitted)).

the residence, Mother appeared to have been crying. E.D. also testified that Mother was crying when the police arrived at the house. And Dallof's testimony indicated Mother told Stricklan that E.D. said he had touched her. On this evidence, a reasonable jury could conclude that Mother's apparent belief that Stricklan was capable of, and had engaged in, what E.D. alleged lent credence to E.D.'s initial report.

¶87 Dallof testified that Stricklan originally told Holdaway that he had entered E.D.'s room to turn off the light and television. *Supra* ¶ 7. E.D. testified that she had awakened during the night because her television was off, and that when she woke up, she saw Stricklan on the floor and went to tell Mother. *Supra* ¶ 13. Thus, the jury heard testimony that Stricklan had entered E.D.'s bedroom sometime after she went to bed, but before police arrived at approximately 5:00 a.m.

¶88 Dallof also testified that he heard Stricklan tell someone on the phone that he acted "inappropriately." Dallof took a note when he heard that statement so that he could "transfer that verbatim into [his] report."

¶89 During Detective Timpson's testimony, the State played a portion of Holdaway's interview with Stricklan a few days after the incident. The jury heard Stricklan, in response to police questioning, indicate that he had not known E.D. to lie. The jury also heard Stricklan tell Holdaway that he did not think that E.D. had made up the story of him touching her.[16]

---

[16] The dissent challenges the persuasive value of this testimony because the jury would have been "well-aware" that by trial Stricklan "denied committing the crime charged" and would have heard his counsel "mount a vigorous defense against this charge." *Infra* ¶ 172 n.87. But this misses the point. The jury heard the defendant tell the police investigating allegations that he had improperly touched a ten-year-old child that he did not think that she was making up those very allegations. Even if he later denied the truth of E.D.'s statements to the police, the jury could conclude that telling the police that he did not think the victim was fabricating her report of abuse is not the best way to proclaim his innocence and is, in fact, rather damning evidence of his guilt. And the jury, who watched the recorded exchange between Stricklan and Holdaway, was free to not credit Stricklan's counsel's argument that Stricklan

(continued ...)

¶90 The State also presented evidence that could suggest a motive for the change in E.D.'s story.[17] E.D. testified what life had been like after Stricklan left the house. E.D. testified that she, Mother, and her grandparents all missed Stricklan. E.D. also testified that Mother cried "a whole bunch of times" when Stricklan left. E.D. stated she sees Stricklan "as [her] own father, [she] treats him as [her] own father." Like in *Seale*, this was evidence from which the jury could infer E.D. changed her story because she missed Stricklan or did not want her mother to be sad because he was gone.

¶91 Stricklan disagrees that this is sufficient evidence to support a conviction and compares his case to a decision of a divided Florida Supreme Court. *See Baugh v. State*, 961 So. 2d 198 (Fla. 2007). A Florida court convicted Baugh of capital sexual battery of his girlfriend's daughter. *Id.* at 201. The night of the incident, the girl told her mother and a detective that Baugh forced her to fellate him. *Id.* at 200–01. At trial, the girl testified that her original story to her mother and the detective was a "fib which she made up to get Baugh in a little, but not that much trouble because sometimes he made her mad." *Id.* at 201 (citation omitted) (internal quotation marks omitted). The girl also explained that she maintained this story

---

was just "confused" when he told the detective that he did not think that E.D. had made up her allegations.

[17] We have recognized that a motive for a witness to change testimony can be evidence to support a conviction. *State v. Seale*, 853 P.2d 862, 876 (Utah 1993). In *Seale*, the child responded, "I don't remember," to each question about whether the defendant had touched her. *Id.* at 866. The child's mother testified she was afraid of losing custody of her daughter. *Id.* She denied encouraging her daughter "to forget things in an effort to retain custody." *Id.* (internal quotation marks omitted). However, the mother's sister testified that the mother had called her the night before the trial in an attempt to get her "not to say anything in court." *Id.* at 867. We determined it would have been reasonable for the jury to conclude that the mother also asked her daughter not to say anything, which prompted the daughter to respond "I don't know" or "I don't remember" when asked about the abuse. *Id.* at 867, 876. There was evidence "from which the jury could have reasonably inferred" that the child's memory loss was "in response to her mother's pressure to keep the incidents quiet." *Id.* at 876.

because she was "afraid of what her mother might do if she found out that [the girl] had lied." *Id.*

¶92  The prosecution introduced evidence from the detective, the child protection team nurse, and the girl's mother about the girl's prior statements. *Id.* The prosecution also introduced testimony from an inmate imprisoned with Baugh who claimed he heard Baugh telling visitors they had to get the girl to recant her story. *Id.* Another family friend testified that the girl told her the abuse really happened, but the girl's mother wanted her to change her story. *Id.* There was no physical or direct evidence to support the girl's original claim of abuse. *Id.* Baugh appealed, claiming the girl's "out-of-court statements were insufficient to sustain his conviction." *Id.*

¶93  In a 4-3 decision, the Florida Supreme Court noted that the "only direct evidence" was the girl's "out-of-court hearsay statements" which she "completely recanted" at trial. *Id.* at 203. It then examined the circumstantial corroborating evidence. *Id.* It noted that "recanted statements can sustain a sexual battery conviction 'when other *proper corroborating evidence* is admitted.'" *Id.* at 204 (citation omitted). The court quoted Black's Law Dictionary that corroborating evidence is "[e]vidence that differs from but strengthens or confirms what other evidence shows,' especially 'that which needs support.'" *Id.*

¶94 The majority determined that the "other evidence" presented during trial "did not actually 'corroborate' the recanted out-of-court statements" and reversed the conviction. *Id.* at 202, 204. It concluded that "[w]here the evidence creates only a strong suspicion of guilt or simply a probability of guilt, the evidence is insufficient to sustain a conviction." *Id.* at 205. And it also stated that "evidence is insufficient to support a conviction when it requires pyramiding of assumptions or impermissibly stacked inferences." *Id.*

¶95 The dissent in *Baugh* was concerned that the majority opinion "nullifie[d] a jury's guilty verdict based essentially on credibility choices." *Id.* at 205 (Cantero, J., dissenting). Three members of the Florida high court would have affirmed the conviction because "the majority takes this close case away from the jury, and usurps the jury's factfinding function in making credibility determinations." *Id.* at 211.

¶96 The dissent would have found the "sum total of the evidence" in the case sufficient to let it go to the jury. *Id.* at 207. It reasoned corroborating evidence should be viewed cumulatively to

determine if it was sufficient to convict. *Id.* The dissent noted this was "a close case" but opined that the child's "shocking description of the incident established elements of the offense; and though it was insufficient by itself to convict the defendant, the other evidence introduced clearly corroborated the child's story." *Id.* at 210. The dissent concluded that "[c]ombined with her statements, the evidence was sufficient to submit the case to the jury, whose job it was to sort out the conflicting stories and the credibility issues" regarding the conflicting statements. *Id.*

¶97 The dissent was also concerned that "by deeming the [recanted statement] in this case insufficient, the majority will make it virtually impossible to convict sexual offenders whenever the victim recants and no physical evidence is available." *Id.* The dissent concluded

> [T]he very purpose of juries is to distinguish between the true and the false, between the sincere and the coerced. With no way to view the demeanor of the witnesses during their testimony, appellate courts are poorly equipped for that role. In cases such as this, where corroborating evidence strongly supports the child's original accusations of sexual abuse and also points toward a forced recantation, we should leave to the jury the responsibility for evaluating witness credibility and arriving at the truth.

*Id.* at 210–11.

¶98 Stricklan urges this court to see the world the way the *Baugh* majority does. Stricklan compares his case to *Baugh* and contends that the other evidence presented at trial was not "so powerful as to eliminate reasonable doubt arising from [E.D.]'s sworn, cross-examined, in-court testimony that Mr. Stricklan did not touch her."

¶99 Much like we do with the divided Montana Supreme Court in *Giant,* we find ourselves more moved by the dissent in *Baugh.* And we conclude that a reasonable jury could look at all of the evidence presented to it—including Stricklan's less-than-convincing denial of the allegations against him, Stricklan's statement that he acted inappropriately, E.D.'s two initial reports of abuse, and E.D.'s less-than-convincing explanation for why she changed her story at trial—and decide beyond a reasonable doubt that Stricklan had touched E.D. inappropriately.

¶100   Ultimately, this came down to a question about whether the jury believed that E.D. told the truth during her first two reports of abuse or when she testified at trial. It is the role of the jury to determine the credibility of evidence and testimony.[18] "The jury is the exclusive judge of credibility." UTAH CODE § 78B-1-128(4). "Thus when conflicting or disputed evidence is presented at a jury trial, the 'jury serves as *the exclusive judge* of both the credibility of the witnesses and the weight to be given particular evidence.'" *State v. Prater*, 2017 UT 13, ¶ 31, 392 P.3d 398 (quoting *State v. Workman*, 852 P.2d 981, 984 (Utah 1993)). The jury was in the best position to hear and evaluate the evidence at trial. It could weigh the credibility of E.D.'s reason for recanting, Stricklan's testimony as to the events of the night of the incident, and the weight of the other circumstantial evidence from the events of the night.

¶101   All of this evidence assumes importance to our analysis in two ways. First, it pulls this case outside the ambit of the *Webb/Ramsey* "rule," which purports to apply when the jury is only given a single, out-of-court and uncorroborated statement on which to convict. Second, the totality of the evidence presented here is enough to permit the jury to believe that E.D.'s initial recitation that Stricklan had inappropriately touched her was correct. And that her recantation was motivated not by a desire to set the record straight but to ameliorate the negative consequences of Stricklan's absence from their home.

---

[18] The dissent states it is "the majority's view that it cannot make its own assessment of the evidentiary weight of E.D.'s hearsay statement." *Infra* ¶ 166. This overstates our position. We contend that the better practice is to recognize that, when an assessment of credibility turns on observing a witness and her demeanor, we afford deference to the trier of fact that had the opportunity to assess the witness's credibility. But recognizing that we grant deference is not a declaration that we must always defer. In this business, we sometimes find that judges and juries have abused the discretion given them. We can foresee instances where the circumstances surrounding the recantation of the prior statement and the paucity of other evidence of the defendant's guilt would cause us to conclude that no reasonable jury could credit the prior inconsistent statement in a way that would dispel reasonable doubt. This is just not that case here.

¶102 We give a "healthy dose of deference" to jury verdicts. *State v. Nielsen*, 2014 UT 10, ¶ 41, 326 P.3d 645; *see also Mackin v. State*, 2016 UT 47, ¶ 20, 387 P.3d 986 ("We grant substantial deference to a jury verdict."); *Workman*, 2005 UT 66, ¶ 29 ("The standard of review for a sufficiency claim is highly deferential to a jury verdict."); *see also Baugh*, 961 So. 2d at 205–11 (Cantero, J., dissenting). Under our deferential standard, enough evidence was before the jury to allow it to dispel reasonable doubt that Stricklan had inappropriately touched E.D. *See State v. Gonzalez*, 2015 UT 10, ¶ 27, 345 P.3d 1168 ("[Defendant] must therefore show that, when viewed in the light most favorable to the State, *no evidence existed* from which a reasonable jury could find beyond a reasonable doubt." (emphasis added)).

## IV. The State Presented Sufficient Evidence of Intent

¶103 Stricklan also argues that the State did not forward evidence of "intent to cause substantial emotional or bodily pain to any individual or with the intent to arouse or gratify the sexual desire of any individual." UTAH CODE § 76-5-404.1(2). Stricklan argues that there was no evidence in front of the jury that could allow it to conclude that he touched E.D. with the intent to arouse sexual desire.

¶104 The district court rejected this argument, reasoning that the State had adduced enough circumstantial evidence of Stricklan's intent to meet its burden. Specifically, the district court discussed "what law enforcement found when they went to the house with the emotions that were going on, overhearing the statement by the defendant on the phone, [and] what we learned from the interview today, among other things" as corroborating evidence. The district court concluded there was "sufficient evidence presented from which a jury acting reasonably could convict the defendant and the State has, in fact, established a prima facie case." We agree.

¶105 We have stated that "intent can be proven by circumstantial evidence." *State v. James*, 819 P.2d 781, 789 (Utah 1991). "The factfinder, however, is entitled to draw all reasonable inferences from the facts and from the actions of the defendant." *State v. Cooley*, 603 P.2d 800, 802 (Utah 1979). Additionally, "unless a confession is made by the defendant concerning intent, or unless the court is somehow able to open the mind of the defendant to examine his motivations, intent is of necessity proven by circumstantial evidence." *James*, 819 P.2d at 789.

¶106 "The criminal intent of a party may be inferred from circumstances such as presence, companionship, and *conduct before and after the offense . . . .*" *State v. Briggs*, 2008 UT 75, ¶ 13, 197 P.3d 628 (emphasis added) (citation omitted) (internal quotation marks omitted). And "[w]hen intent is proven by circumstantial evidence, we must determine (1) whether the State presented any evidence that [Defendant] possessed the requisite intent, and (2) whether the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove that [Defendant] possessed the requisite intent." *State v. Holgate*, 2000 UT 74, ¶ 21, 10 P.3d 346 (citation omitted) (internal quotation marks omitted).

¶107 The court of appeals has had more opportunities than we have had to opine on what evidence suffices to demonstrate intent to cause pain or arouse sexual desire. *See, e.g.*, *State v. Watkins*, 2011 UT App 96, 250 P.3d 1019, *rev'd on other grounds*, 2013 UT 28, 309 P.3d 209; *State v. Tueller*, 2001 UT App 317, 37 P.3d 1180. For example, in *Watkins*, the defendant was convicted of aggravated sexual abuse of a child. 2011 UT App 96, ¶ 1. While staying at a relative's house, Watkins drank "a significant amount of alcohol [one] night," and a child in the home awoke to find Watkins in her bed and kissing her on the side of her head. *Id.* ¶ 3. After the child asked him to stop and leave, Watkins began "pinching or rubbing her buttocks with his hand." *Id.* (internal quotation marks omitted). Watkins left after the second time the child told him to leave, but he later returned to give her a $100 bill and told her not to tell anyone about the money. *Id.* The court of appeals found sufficient evidence of intent because there appeared to be "no legitimate reason" for Watkins to be in the child's room at the time of the incident and there was no alternative explanation for why he kissed the child "wetly on the side of her head for approximately three minutes" and pinched and rubbed the child's buttocks for two minutes. *Id.* ¶ 18. And giving the child $100 immediately following the incident could be construed to mean that Watkins knew he had done something wrong. *Id.*

¶108 In *Tueller*, the defendant was convicted of sexual abuse of a child. 2001 UT App 317, ¶ 1. A witness observed Tueller in a men's bathroom, "laying on top of . . . a nine-year-old girl with an I.Q. of 60, on the bathroom floor." *Id.* ¶ 2. Tueller's pants were "pulled down to his buttocks" and the girl's underwear was "pulled down to her knees and her legs were kind of open." *Id.* (internal quotation marks omitted). Tueller had one knee between the girl's legs and his head was on her chest. *Id.* The court of appeals found this evidence sufficient to support intent to "arouse or gratify the sexual desire of

any person" since there was "no conceivable explanation for the circumstances" where the witness viewed Tueller on top of the girl. *Id.*¶ 20; *see also In re D.M.*, 2013 UT App 220, 310 P.3d 741 (finding circumstantial evidence of intent when the minor dared the victim to crawl under a futon before pulling down the victim's pants and touching the victim's testicles); *State v. Bair*, 2012 UT App 106, 275 P.3d 1050 (finding circumstantial evidence of intent in a letter in which defendant admitted to being addicted to "'touchy/feely' aspects of sex, and the abuse [the victim] reported coincide[d] with this admitted addiction"); *State v. Singh*, 2011 UT App 396, 267 P.3d 281 (finding circumstantial evidence of intent to include expressions of love and kissing the victim); *State v. Maness*, 2010 UT App 370U, 2010 WL 5452078 (finding circumstantial evidence of intent included entering a massage room early, moving drapes, touching genitalia during a massage procedure that did not require such touching, and lingering after concluding the massage); *State v. Hall*, 946 P.2d 712, 724 (Utah Ct. App. 1997) (finding circumstantial evidence of intent included pulling down the victim's shorts and underwear and stroking her genital area).

¶109 As the court of appeals has observed, intent can "reasonably be inferred with a basis in logic and human experience." *State v. Von Niederhausern*, 2018 UT App 149, ¶ 20, 427 P.3d 1277 (citation omitted) (internal quotation marks omitted) (finding the defendant's conduct was "more than just a simple, familial gesture or a harmless or accidental physical act"). The same analysis and logic apply in this case. We review the sufficiency of the evidence of intent to determine whether a reasonable jury could have found this element was met beyond a reasonable doubt.

¶110 E.D. testified that she originally told officers that Stricklan touched her "boobs" *and* "right at the bottom." The jury could reasonably conclude that Stricklan touching *both* E.D.'s breasts and buttocks negated any suggestion that he accidentally touched her.

¶111 Furthermore, E.D.'s first reaction after the alleged touching was to wake up Mother and tell her what happened. This also tends to indicate the touch was neither accidental nor incidental. And the jury could reasonably infer that when a grown man enters the room of a child after she goes to bed and touches her breasts and buttocks that the purpose of such touching was sexual gratification.

¶112 Mother questioned Stricklan, and Stricklan eventually called the police. The detective's response was to ask Stricklan to leave the house that night, at which point the jury heard testimony that Stricklan admitted to acting "inappropriately" on a phone call to

his father. Again, the jury could reasonably infer from Stricklan's characterization of how he had acted that Stricklan touched E.D. with the requisite intent.

¶113   We have repeatedly recognized that the jury is in the best position to judge the credibility of testimony and weigh the evidence. *See Mackin v. State*, 2016 UT 47, ¶ 20, 387 P.3d 986 ("We grant substantial deference to a jury verdict."); *State v. Nielsen*, 2014 UT 10, ¶ 41, 326 P.3d 645 (recognizing the "healthy dose of deference owed to factual findings and jury verdicts"); *State v. Workman*, 2005 UT 66, ¶ 29, 122 P.3d 639 ("The standard of review for a sufficiency claim is highly deferential to a jury verdict."). We do not fault the district court for deferring to the jury's determination that Stricklan touched E.D. with the requisite intent.

## V. The Dissent's Alternative Narrative Does Not Demonstrate that the Jury Must Have Entertained a Reasonable Doubt About Stricklan's Guilt

¶114   The dissent presents an alternative reading of each of the individual facts and testimony that the State presented to the jury.[19] But imagining other ways the jury might have interpreted pieces of evidence is not our assigned task. When reviewing the sufficiency of the evidence to sustain a conviction

> [t]he question presented is not whether we can conceive of alternative (innocent) inferences to draw from individual pieces of evidence, or even whether we would have reached the verdict embraced by the jury. It is simply whether the jury's verdict is reasonable in light of all of the evidence taken cumulatively, under a standard of review that yields deference to all reasonable inferences supporting the jury's verdict.

*State v. Ashcraft*, 2015 UT 5, ¶ 24, 349 P.3d 664. In *Ashcraft*, we concluded that there was sufficient evidence before the jury that the defendant was "in constructive possession" of drugs. *Id.* ¶ 30. We then concluded that "[w]e cannot disturb the jury's conclusion just because it *could have* reasonably come to a different one." *Id.* And in response to the *Ashcraft* dissent's presentation of an alternative

---

[19] But, as we explain, the dissent also fails to indulge inferences in favor of the verdict and, in some instances, improperly dismisses the evidence the jury heard.

explanation for the evidence against the defendant, we stated, "the fact that we can identify an 'equally' plausible alternative inference is not nearly enough to set [a] verdict aside." *Id.* ¶ 25. In the end, the issue is "not whether some other (innocent) inference might have been reasonable. It is simply whether the inference adopted by the jury was sustainable." *Id.* ¶ 27; *see also Mackin v. State*, 2016 UT 47, ¶ 29, 387 P.3d 986 (citing *Ashcraft* and other cases establishing our duty in reviewing the sufficiency of the evidence); *State v. Law*, 2020 UT App 74, ¶ 12, 464 P.3d 1192 (same). So, even if there is another interpretation of the facts, our job is to determine whether the version adopted by the jury was sufficiently persuasive to remove reasonable doubt of the defendant's guilt.

*A. The Jury Could Reasonably Conclude
that Stricklan Touched E.D.*

¶115 The dissent dismisses E.D.'s testimony concerning her previous reports of abuse as "a *reference* to an out-of-court statement in which E.D. claimed that Mr. Stricklan" touched her and "testimony regarding how others reacted to this claim." *Infra* ¶ 170.

¶116 To characterize E.D.'s testimony as a "reference" ignores the reality of what the State presented to the jury. The jury heard E.D. confirm that she had twice told the police that Stricklan had touched her—once the night of the incident and another at the CJC interview. After E.D. watched her CJC interview outside the presence of the jury, the prosecutor questioned E.D., in front of the jury, about the statements she had previously made to the detective. She was asked questions about what she told the detective. The State asked her to confirm that she had told the detective that Stricklan touched her "right at the bottom." Although E.D. could not remember whether she had told the detective if Stricklan had touched her over or under her clothing, she confirmed that she had said that Stricklan touched her "on the back and chest area," and she clarified that when she said "chest area" she meant her "boobs." This is more than just a passing reference to a previous statement E.D. had made.

¶117 The dissent points out that the jury did not see E.D.'s demeanor when she made the out-of-court statements to the detective. *Infra* ¶ 173. But the jury did see the prosecutor question E.D. about her previous statements to the police that Stricklan touched her. And the jury heard E.D.'s trial testimony that Stricklan did not touch her, and it heard the testimony of other witnesses as described above. The jury was in the best position to weigh all the evidence and determine the credibility of that evidence. It may not

have had the advantage of seeing E.D. twice tell her original story that Stricklan touched her, but it was in a better position than the members of this court to weigh her testimony about what she had said against her recantation, as well as all the other evidence presented at trial.

¶118 The dissent spends a lot of time offering alternative interpretations of the evidence the jury heard. For instance, it claims that the fact that Mother "was crying when police arrived" was not inconsistent with E.D.'s recantation. *Infra* ¶ 175. And that Mother's questioning Stricklan could have been the duty of a responsible mother and that "a mother is likely to investigate [an allegation of sexual abuse] even if she suspects it might not be true." *Infra* ¶ 175. The dissent also says that when Stricklan said that he needed a ride because he "acted inappropriately" it is possible that the officer misheard Stricklan. *Infra* ¶ 178. Or, that even if the officer heard Stricklan correctly, it could be "reasonable to assume" that Stricklan's reference to inappropriate acts was a reference to "his excessive drinking and not to any acts of sexual abuse." *Infra* ¶ 180.[20]

¶119 And although the dissent paints a portrait of how a jury might have interpreted this evidence, that is not the entirety of our job when reviewing the sufficiency of the evidence. We review the evidence, "viewed in the light most favorable to the State, [to determine if] 'some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt.'" *State v. Gonzalez*, 2015 UT 10, ¶ 27, 345 P.3d 1168 (citation omitted). It is of no moment that we can offer alternative

---

[20] The dissent also dismisses Stricklan's concessions to police that E.D. had never lied to him and that he did not believe that she was making up her story. To the dissent, Stricklan's admissions can be discounted because E.D. lied at least once "either in her out-of-court statement or under oath at trial." *Infra* ¶ 176.

This misses the mark. The importance of this testimony is not that the jury heard that E.D. had never lied to Stricklan, so the jury should think that E.D. always tells the truth. The importance is that the jury heard a detective, while interrogating Stricklan about the allegations E.D. had levelled against him, ask Stricklan, "So do you think she's making this up?" And the jury heard Stricklan say, "no." The jury could reasonably conclude that this not only corroborated E.D.'s reports of abuse but also that it was a functional admission of guilt.

explanations, or even that we would have reached a different conclusion had we served on the jury. The question is whether enough evidence existed to permit the jury to reach its verdict. For the reasons we have explained, the State presented sufficient evidence to support the conclusion that Stricklan inappropriately touched E.D. And that conclusion ends our ability to second-guess what the jury concluded.

*B. The Jury Could Reasonably Conclude that*
*Stricklan Touched E.D. with the Requisite Intent*

¶120   The dissent also agrees with Stricklan that the State failed to introduce sufficient evidence to permit the jury to conclude that he touched E.D. with the "intent to cause substantial emotional or bodily pain to any individual or with the intent to arouse or gratify the sexual desire of any individual." UTAH CODE § 76-5-404.1(2). The dissent likens this case to a court of appeals decision, *State v. Whitaker*, 2016 UT App 104, 374 P.3d 56. *Infra* ¶ 185. In *Whitaker*, the defendant was also accused of aggravated sexual abuse of his stepdaughter. 2016 UT App 104, ¶¶ 1, 3. The girl testified that Whitaker took her hand and "slowly put it between his legs," "on his private part," while her "palm was up." *Id.* ¶ 4. The court of appeals noted there was no evidence that Whitaker acted suggestively, attempted to ensure the child's silence, or that he held the child's hand in place or "otherwise manipulated it." *Id.* ¶ 15. Because the court was unwilling to take a "speculative leap," it concluded the State did not present any evidence other than the touch itself, and that meant there was insufficient evidence to prove Whitaker acted with the requisite intent. *Id.* ¶¶ 18–19. Namely, the State did not present "evidence other than the act itself, which act was not a typical sexual activity" to prove beyond a reasonable doubt that Whitaker acted with the requisite intent. *Id.* ¶ 18.

¶121   We were not afforded an opportunity to review that decision. And while we are not in position to review it now, we view with some skepticism the conclusion that it takes a "speculative leap" to conclude that a grown man who places a child's hand on his penis does so for the purpose of sexual arousal. We would also note that here, unlike in *Whitaker*, there was other circumstantial evidence present that Stricklan acted with the requisite intent. *See supra* ¶¶ 110–13. Most notably, E.D.'s report that she was touched both "right at the bottom" and on her "boobs." *See supra* ¶ 110.

¶122   The dissent nevertheless accuses us of similarly taking a "speculative leap" because E.D.'s out-of-court statements "did not provide any additional details from which we could infer intent."

*Infra* ¶ 188. The dissent again presents another way the jury could have interpreted the evidence that Stricklan touched E.D.: that he inadvertently touched her while tucking her in. *Infra* ¶¶ 189–90.

¶123 In the end, the dissent may offer an alternative explanation, but it does not demonstrate how that other explanation must have created reasonable doubt in the jury's collective mind. *See Ashcraft*, 2015 UT 5, ¶ 30 ("We cannot disturb [a] jury's conclusion just because it *could have* reasonably come to a different one."). As noted above, the jury could conclude that when a grown man enters the room of a child after she has gone to bed, and touches her in two intimate places, and shortly thereafter tells his father that he has acted inappropriately, that he has acted with the requisite intent.

## VI. Stricklan Did Not Preserve His Argument that E.D.'s Testimony Was Inherently Improbable

¶124 Stricklan also argues that E.D.'s testimony was inherently improbable. Stricklan points to our decision in *State v. Robbins* in which we tossed out a conviction because the victim's testimony was inherently improbable. 2009 UT 23, 210 P.3d 288.

¶125 The State counters that the *Robbins* argument is unpreserved. The State argues that Stricklan's motions to the district court only raised "one specific issue—that his conviction could not stand on the basis of E.D.'s recanted prior statements alone, relying on *Webb* and *Ramsey*." Stricklan claims that the State misunderstood his argument and that he is arguing that even if this court overruled or narrowed *Webb* and *Ramsey*, "for the same reasons he argued below and on appeal that the evidence fails under the *Webb/Ramsey* rule, the evidence is also so inconclusive and inherently improbable that a reasonable jury could not have believed beyond a reasonable doubt that he committed the offenses." We agree that Stricklan has not preserved the *Robbins* issue as it concerns a distinct legal theory from those he argued below.

¶126 When we talk about preservation, "our case law draws a distinction between new 'issues' (like distinct claims or legal theories) and new 'arguments' in support of preserved issues." *Hand v. State*, 2020 UT 8, ¶ 6, 459 P.3d 1014 (citing *State v. Johnson*, 2017 UT 76, ¶ 14 n.2, 416 P.3d 443). In *Johnson* we stated that how an appellant argues the issue is "semantics" and what is required is for courts to "look at the underlying policies to determine whether new arguments are actually entirely new issues." *Johnson*, 2017 UT 76, ¶ 14 n.2 (citing *Patterson v. Patterson*, 2011 UT 68, ¶ 15, 266 P.3d 828). Our case law "confirms that we view *issues* narrowly, but also

[makes] it clear that new *arguments*, when brought under a properly preserved issue or theory, do not require an exception to preservation. Such arguments include citing new authority or cases supporting an issue that was properly preserved." *Id.*

¶127 An issue is preserved if it was presented before the district court "in such a way that the court has an opportunity to rule on it. To provide the court with this opportunity, the issue must be specifically raised [by the party asserting error], in a timely manner, and must be supported by evidence and relevant legal authority." *Id.* ¶ 15 (citation omitted) (internal quotation marks).

¶128 Here the district court did not have an opportunity to rule on the *Robbins* issue. Indeed, the district court never would have known that Stricklan wanted it to assess the inherent improbability of E.D.'s testimony. None of the arguments below articulated a *Robbins* argument nor suggested that E.D.'s testimony was "inherently improbable." Stricklan's arguments in both of his motions are largely, if not solely, tied to *Ramsey* and *Webb*.

¶129 We do not find anywhere in the record where Stricklan referenced *Robbins*, the *Robbins* standard, argued that E.D.'s testimony met this standard, or asked that E.D.'s testimony be entirely disregarded.

¶130 Stricklan's best preservation argument focuses on his motion to arrest judgment. There, Stricklan quoted a chunk of our decision in *State v. Workman*, 852 P.2d 981, 984 (Utah 1993), regarding the standard a court should employ to decide whether to set aside a verdict for insufficient evidence. In *Workman*, we stated, "a trial court may arrest a jury verdict when the evidence, viewed in the light most favorable to the verdict, is so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element." 852 P.2d at 984 (citing *e.g.*, *State v. Petree*, 659 P.2d 443, 444 (Utah 1983)). Although Stricklan quoted that language to the district court, he never argued that E.D.'s testimony was "inherently improbable."

¶131 Before us, Stricklan argues that the district court's language briefly used the term "inherently improbable" when it ruled on his motion to arrest judgment. The district court stated, "I'll assess the evidence viewed in the light most favorable to the jury's verdict and determine if it is sufficiently inconclusive or so *inherently improbable* that reasonable minds must have entertained a reasonable doub[t] as to an element." (Emphasis added.) But again, it appears

that this was simply a reference to the general standard *Workman* articulated and not a sign that the district court actually considered whether E.D.'s testimony was inherently improbable. Because this issue was not presented to the district court, it is not preserved.

## CONCLUSION

¶132   We give great weight to a jury verdict. A jury is in the best position to assess evidence and determine credibility of witness testimony. In this case, the evidence was sufficient to sustain Stricklan's convictions. The State presented evidence to corroborate E.D.'s original claim that Stricklan had touched her breasts and buttocks. And the State introduced sufficient evidence to permit the jury to conclude that Stricklan had touched E.D. with the required intent. Any argument that E.D.'s testimony was inherently improbably is unpreserved. Accordingly, we affirm Stricklan's convictions.

───────────

CHIEF JUSTICE DURRANT, dissenting:

## INTRODUCTION

¶133   We must decide whether Mr. Stricklan can be convicted of aggravated sexual abuse where there is no physical evidence that E.D.—the alleged victim—was sexually abused (let alone physical evidence connecting Mr. Stricklan to the alleged crime), no witnesses who testified under oath that they believed sexual abuse occurred or that Mr. Stricklan committed the crime, and no expert testimony opining that the alleged victim had been abused, and where the only two people (E.D. and Mr. Stricklan) who would have personal knowledge of the facts underlying the alleged abuse now unequivocally maintain that no crime occurred. The majority concludes the evidence is sufficient because E.D. had previously made unsworn, out-of-court statements claiming the crime occurred. According to the majority, it was the jury's role to weigh the "credibility" of these statements against the credibility of E.D.'s unequivocal recantation at trial. And the majority affirms Mr. Stricklan's conviction because it is unwilling to second guess what it deems to be the jury's credibility determination. I disagree.

¶134 In my view, the majority errs in failing to apply the controlling precedent we established in *State v. Webb* and *State v. Ramsey* regarding convictions that are based almost entirely on uncorroborated hearsay. And the majority errs in its ultimate conclusion because E.D.'s previous hearsay claim—upon which

Mr. Stricklan's conviction is entirely based—is insufficient to establish the elements of sexual abuse, especially to establish the element of intent.

## ANALYSIS

¶135 I disagree with the majority's determination that the evidence in this case is sufficient to sustain Mr. Stricklan's guilty verdict. In my view, the majority errs in making this determination for two reasons. First, the majority errs in concluding that the principles established in *State v. Webb*[21] and *State v. Ramsey*[22] apply only in cases where the "evidence of guilt consists solely of an uncorroborated out-of-court statement."[23] Because the principles established in *Webb* and *Ramsey* apply any time the State introduces hearsay statements as evidence, those principles apply to our review of E.D.'s out-of–court statements in this case. And in applying those principles to the facts of this case (where there is no physical evidence of a crime—or Mr. Stricklan's connection to it—and, at trial, the only two people who would have personal knowledge of the alleged crime unequivocally maintained that no crime occurred), I conclude the evidence is insufficient to support a guilty verdict.

¶136 Second, the majority errs in concluding there is sufficient evidence of the "intent" element. Even were I to disregard the legal principles discussed in *Webb* and *Ramsey*, I would nevertheless conclude that E.D.'s hearsay evidence, which amounted to nothing more than a reference to a past claim of touching, is insufficient to support a finding that Mr. Stricklan had the requisite criminal intent. For these reasons, I dissent.

### I. The Majority Errs in Misreading and, as a Result, Wholly Discounting Our Holdings in *State v. Webb* and *State v. Ramsey*

¶137 The majority misreads our holdings in *State v. Webb*[24] and *State v. Ramsey*.[25] As the majority notes, Mr. Stricklan's and the State's briefings focused primarily on the applicability of our

---

[21] 779 P.2d 1108 (Utah 1989).

[22] 782 P.2d 480 (Utah 1989).

[23] *Supra* ¶ 83.

[24] 779 P.2d 1108 (Utah 1989).

[25] 782 P.2d 480 (Utah 1989).

holdings in those cases. Mr. Stricklan argued that *Webb* and *Ramsey* established the bright-line rule that a single, uncorroborated hearsay statement is insufficient to support a verdict. Although the State does not contest this characterization, it argues that *Webb* and *Ramsey* are factually distinguishable and, therefore, do not apply.

¶138   The majority, on the other hand, takes "a different lesson from the holdings of those opinions."[26] After a careful review of our opinions in *Webb*, *Ramsey*, and their progeny, the majority concludes that *Webb* and *Ramsey* do not establish a bright-line rule, as the parties have argued. Instead, the majority explains that under *Webb* and *Ramsey*, "we do what we always do when a defendant's seeks to set aside her conviction arguing insufficient evidence: we review all of the evidence before the jury to see if it dispels reasonable doubt of the defendant's guilt."[27] So far so good. I agree with the majority's reading of *Webb* and *Ramsey* to this point.

¶139   But the majority's reading of *Webb* and *Ramsey* comes off the rails when it states that the rule established in those cases does "very little analytical work."[28] As I'll explain, this suggests that the majority misses the central point in our *Webb* and *Ramsey* decisions: that in reviewing the sufficiency of the evidence, an appellate court should assess the reliability of hearsay, even where the hearsay has been admitted into evidence through a judicially or legislatively created exception.[29] And, where a conviction is based "almost

---

[26] *Supra* ¶ 38.

[27] *Supra* ¶ 60.

[28] *Supra* ¶ 60.

[29] It appears that the majority and I are in agreement that neither *Webb* nor *Ramsey* modifies the traditional inquiry we use when we consider a challenge to the sufficiency of the evidence. *Supra* ¶ 82. The majority is also correct in noting that although "we may, in this case, weigh the evidence differently," we both agree that our inquiry is aimed at determining whether "evidence existed from which a reasonable jury could find beyond a reasonable doubt" that the defendant committed the crime. *Supra* ¶ 82. So I disagree with the majority only to the extent it suggests that appellate courts are barred from assessing the reliability of hearsay evidence in making their sufficiency assessment. In my view, that is the central point of our decisions in *Webb* and *Ramsey*. *See infra* ¶¶ 140-65.

entirely" on an unreliable hearsay statement, the evidence is insufficient to sustain a conviction. After discussing the legal principles in *Webb* and *Ramsey*, I will apply them to this case.

*A.* Webb *and* Ramsey *Make Clear that Courts May Assess the Reliability of Hearsay Statements and that, Where a Conviction is Based Almost Entirely on Unreliable Hearsay, the Evidence is Insufficient to Sustain the Conviction*

¶140   Due to the inherent unreliability of hearsay, courts have long treated hearsay statements with caution. "A hearsay statement can never be subjected to the same degree of scrutiny through cross-examination as can live testimony. Thus, the opponent may never be able to expose, and the trier of fact never learn, the possible reliability problems of a given hearsay statement. This is true even when the declarant takes the witness stand and relates his or her own prior out-of-court statement."[30] So, "[i]n the absence of special reasons, the perceived untrustworthiness of [hearsay] has led the Anglo-Saxon legal system to exclude it . . . despite its potentially probative value."[31] And, even where special reasons exist to admit hearsay—because the hearsay is admissible through a common-law or legislative exception—appellate courts have nevertheless considered hearsay's "unreliable character . . . in determining the weight that should be given it."[32]

---

[30] Stanley A. Goldman, *Guilt by Intuition: The Insufficiency of Prior Inconsistent Statements to Convict*, 65 N.C. L. REV. 1, 17 (1986).

[31] Laurence H. Tribe, *Triangulating Hearsay*, 87 HARV. L. REV. 957, 958 (1974).

[32] *Johnson v. Geddes*, 161 P. 910, 917–18 (Utah 1916) (McCarty, J., concurring); *see also Care & Prot. of Rebecca*, 643 N.E.2d 26, 33 (Mass. 1994) (explaining that under "traditional principles governing the use of hearsay evidence" courts should "assess the reliability of such evidence in connection with deciding how much weight to accord it"). The majority suggests that the *Rebecca* case is distinguishable because it dealt with "a specific Massachusetts statute regarding the admissibility of hearsay statements made by young victims of sexual abuse." *Supra* ¶ 76. But in this case we are also dealing with hearsay statements made by a young victim of sexual abuse that were admitted under an enacted exception to the traditional hearsay bar. So the cases, and the policies underlying them, are substantially similar.

(continued ...)

¶141 For example, in *United States v. Orrico*,[33] the Sixth Circuit Court of Appeals reversed a criminal conviction after considering the evidentiary weight of hearsay evidence. In that case, a man had been convicted of a crime based "entirely" on hearsay evidence.[34] In assessing the sufficiency of this evidence, the court noted that under common law hearsay principles, the hearsay statements at issue would have been inadmissible as substantive evidence of the defendant's guilt.[35] But, because the federal evidence rules had recently been amended to create "a very broad standard of admissibility with the goal of placing all relevant evidence before the trier of fact," the hearsay had been admitted.[36]

¶142 But the fact that the hearsay evidence was admissible did not settle the dispute over the evidence's sufficiency. As the court noted, even where the admission of hearsay evidence enables the government "to make out a prima facie case," it is "unlikely that a reasonable juror could be convinced beyond a *reasonable* doubt by such evidence alone."[37] The court further explained that it could "conceive of such an 'unusual case,' where, for example, a *purely technical* element of a crime is established solely through" formerly inadmissible hearsay evidence and there exists a "strong indicia of reliability and an adequate foundation" for that evidence.[38] But,

---

The majority also points out that the court's holding in *Rebecca* did not *require* courts to consider the reliability of hearsay statements after they had been admitted. *Supra* ¶¶ 76–77. Very well. I do not argue that *Webb* or *Ramsey* establishes a bright-line requirement to conduct a reliability analysis of hearsay in every case. Instead, my only point is that our decisions in *Webb* and *Ramsey* are consistent with the "traditional principles governing the use of hearsay evidence" recognized in *Rebecca*: that even where hearsay evidence has been admitted through a valid exception, courts are nevertheless free to "assess the reliability of such evidence in connection with deciding how much weight to accord it."

[33] 599 F.2d 113 (6th Cir. 1979).

[34] *Id.* at 117.

[35] *Id.*

[36] *Id.*

[37] *Id.* at 118 at (emphasis added).

[38] *Id.*(emphasis added).

according to the court, "when such evidence is the only source of support for the central allegations of the charge," the government could not meet its burden of proving, beyond a reasonable doubt, "that a substantial factual basis [existed] as to each element of the crime."[39]

¶143   In other words, even though the court in *Orrico* noted that formerly inadmissible hearsay evidence "may be used to corroborate evidence which otherwise would be inconclusive, [to] fill in gaps in the Government's reconstruction of events, or [to] provide valuable detail which would otherwise have been lost through lapse of memory," it held that the government fails to "to sustain its burden of proving guilt beyond a reasonable doubt" where hearsay evidence is "the sole evidence of a central element of the crime charged."[40]

¶144   As the Montana Supreme Court explained in *State v. Giant*, the "entire analysis in [*Orrico*] revolves around the questionable reliability of [hearsay] statements."[41] After noting this, the court in *Giant* conducted a similar analysis.

¶145   In that case, the court considered a number of state and federal cases, including *Orrico*, in its effort to determine whether an out-of-court statement provided sufficient evidence to sustain a conviction.[42] In so doing, the court recognized that recent amendments to its rules of evidence, which allowed previously inadmissible hearsay to be admitted as substantive evidence, had created some tension between "the issue of admissibility and the issue of sufficiency."[43] The court noted that the "[s]ufficiency of

---

[39] *Id.*

[40] *Id.* at 119.

[41] 37 P.3d 49, 56 (Mont. 2001), *overruled on other grounds by State v. Swann*, 160 P.3d 511 (Mont. 2007).

[42] *Id.* at 50.

[43] *Id.* at 55. The court in *Giant* explained that it was not alone in grappling with this issue: "[a]fter the modernization of [a hearsay rule regarding prior inconsistent statements], state and federal case law began to struggle with the issue of the sufficiency of prior inconsistent statements as the sole proof supporting a conviction." *Id.* I note that the hearsay at issue in this case was admitted under Utah's counterpart to the prior-inconsistent statement rule discussed in *Giant*.

evidence is a determination that depends on the facts specific to a case and addresses the question of whether the evidence supports a conviction such that any rational trier of fact could find guilt beyond a reasonable doubt."[44] But it explained that when "a conviction is supported solely by a prior inconsistent statement, a review of the evidence for sufficiency so as to assess whether any rational trier of fact could find guilt beyond a reasonable doubt *inevitably involves a review of the degree of reliability of the prior inconsistent statement*."[45] For this reason, according to the court, the "sufficiency of such evidence is completely dependent on its reliability."[46]

---

[44] *Id.*

[45] *Id.* (emphasis added).

[46] *Id.* at 56. The majority argues that I have overstated the holding in *Giant. Supra* ¶ 78. But the majority concedes that the court in *Giant* conducted its sufficiency of the evidence review by "gaug[ing] the reliability" of hearsay statements and that it gauged the reliability of these statements by "assessing whether the prosecution had introduced evidence that corroborated the [hearsay]." *Supra* ¶ 78. But that is my only point. I argue that our decisions in *Webb* and *Ramsey* adopted the rule that when courts are assessing the sufficiency of evidence, they are permitted to weigh the reliability of hearsay evidence as a part of that assessment. The majority, in contrast, states that it is bound to presume that the hearsay statement in this case is reliable because it has identified other evidence that can be interpreted consistent with a guilty verdict. *Supra* ¶ 71. This is inconsistent with what we did in *Webb* and *Ramsey* and with what the majority and dissent did in *Giant. See Giant*, 37 P.3d at 60 (Gray, C.J., dissenting) (expressing agreement with "virtually everything" in most of the majority opinion, including the majority's assertion that a sufficiency-of-the evidence review "inevitably involves a review of the degree of reliability of [hearsay]"). In fact, the majority's approach is an approach the majority and dissent in *Giant* explicitly rejected.

In *Giant*, the State of Montana argued that the hearsay statements at issue "should be considered reliable and sufficient as the sole basis for identifying Giant as the assailant because [the declarant's] prior statements were consistent with the physical evidence, three of her statements were given right after the incident, at least one was tape-recorded, and [one of the statements] was notarized." *Id.* at 59. But

(continued ...)

¶146 So the decisions in *Orrico* and *Giant* establish that even where formerly inadmissible hearsay evidence is deemed admissible under a more recently created hearsay exception, appellate courts should nevertheless weigh the evidence's reliability as part of its sufficiency assessment.

¶147 Our reasoning in *Webb* is consistent with this principle. In *Webb*, we reversed a conviction for sexual abuse that stood "almost entirely on one out-of-court declaration of [a] child."[47] In so doing, we noted that a recent legislative enactment allowed for the "[a]dmission of hearsay statements by child sexual abuse victims."[48] And we explained that before the legislature enacted this statute, "it was almost certain that the testimony of a child as young as the victim [in the case] would not be admissible."[49] But even though the hearsay statement was admissible through a legislative exception to the hearsay rule, this did not prevent us from weighing that statement's probative value on appeal.

¶148 Rather, we explained, based on the circumstances in the case, that it was "beyond credulity that the law could allow a conviction to stand on such evidence."[50] And, citing the Sixth Circuit's decision in *Orrico*, we stated that "a single uncorroborated hearsay statement is not substantial evidence and not sufficient to support a verdict."[51] So our decision in *Webb* makes clear that even

---

the court rejected this argument because it was based on a misunderstanding of its case law. According to the court, Montana case law required that "statements must be corroborated by independent evidence of Giant's identity as the assailant for the denial of directed verdict to stand." *Id.* In other words, it was not enough that there was additional evidence that could reasonably be interpreted consistent with the crime at issue. For hearsay evidence to be sufficient to support a conviction, the State needed to present evidence that independently corroborated the hearsay statement. In view of the plain language of our opinions in *Webb* and *Ramsey*, it is clear that Utah requires the same. *See infra* ¶¶ 159-65.

[47] 779 P.2d at 1115.

[48] *Id.* at 1110.

[49] *Id.*

[50] *Id.* at 1115.

[51] *Id.*

where a hearsay statement is deemed admissible through a legally-recognized hearsay exception, we may nevertheless assess the reliability and evidentiary weight of the statement as part of our sufficiency analysis.

¶149   This is also true of our *Ramsey* opinion. In that case, we again considered whether a conviction for sexual abuse, which was based almost entirely on hearsay evidence, was sufficient.[52] Although we acknowledged that the hearsay evidence was properly admitted as "substantive evidence," we explained that "not all substantive evidence is of equal probative value."[53] And we noted that a "conviction not based on substantial reliable evidence cannot stand."[54] After considering the facts presented in the case, including the fact that the child who made the hearsay statement at issue had denied the truthfulness of that statement in court and under oath, we cited *Orrico* for the proposition that where hearsay statements are "the only source of support for the central allegations of the charge," the government has not met its burden of offering "a substantial factual basis as to each element of the crime providing support for a conclusion of guilt beyond reasonable doubt."[55] And we cited *Webb* for the proposition that a "single uncorroborated hearsay statement was not substantial evidence and not sufficient to support the verdict."[56]

¶150   Based on these principles, we concluded that "a conviction that is based entirely on a single, uncorroborated hearsay out-of-court statement that is denied by the declarant in court under oath cannot stand."[57] And for this reason, we deemed the evidence in the case insufficient to uphold the guilty verdict.[58] So our decision in *Ramsey*, like the decisions in *Orrico* and *Webb*, makes clear that, on appeal, we may weigh the reliability and probative value of hearsay

---

[52] *Ramsey*, 782 P.2d at 482–83.

[53] *Id.* at 483.

[54] *Id.*

[55] *Id.* at 484.

[56] *Id.*

[57] *Id.*

[58] *Id.*

in assessing the sufficiency of the evidence supporting a guilty verdict.

¶151   This is an important principle. But it is one the majority seems to ignore in affirming Mr. Stricklan's conviction. As noted above, the majority dismisses our decisions in *Webb* and *Ramsey* as doing "very little analytical work."[59] And it ultimately grounds its decision on an unwillingness to second-guess what it deems was a "credibility" determination the jury made between E.D.'s trial testimony and her recanted out-of–court statements. But in so doing, the majority suggests, contrary to what we did in *Webb* and *Ramsey*, that we are unable to weigh the reliability and the probative value of hearsay evidence on appeal. So the majority's reasoning is inconsistent with the reasoning in *Webb* and *Ramsey* (and *Orrico*).

¶152   In fact, the majority takes its misreading of our *Webb* and *Ramsey* opinions one step further when it concludes that the existence of other, circumstantial evidence takes this case "outside the ambit of the *Webb/Ramsey* 'rule.'"[60] As I will discuss in part B of this section, when the principles discussed in *Webb* and *Ramsey* are applied to the facts of this case, the evidence is insufficient to sustain Mr. Stricklan's conviction. But, first, I note that the majority's conclusion that the reasoning we employed in *Webb* and *Ramsey* does not apply here (because the jury in this case was given more than "a single, out-of-court and uncorroborated statement on which to convict") is inconsistent with both *Webb* and *Ramsey*. This is because in *Webb* and *Ramsey*, there was not only additional evidence presented, but the evidence in both cases was stronger than what has been presented in this case.

¶153   For example, the majority argues the fact that E.D.'s mother immediately asked Mr. Stricklan about E.D.'s accusation (and the fact that the mother was crying when the police showed up) provided the jury with evidence from which it could conclude the mother believed "that [Mr.] Stricklan was capable of, and had engaged in, what E.D. alleged he had done."[61] And in this way, the evidence lent "credence to E.D.'s initial report."[62]

---

[59] *Supra* ¶ 60.

[60] *Supra* ¶ 101.

[61] *Supra* ¶ 86.

[62] *Supra* ¶ 86.

¶154 But the same could be said of the evidence presented in *Webb* and *Ramsey*. In *Webb*, for example, the fact that the mother acted as the State's "chief witness," and had presumably reported the alleged abuse to the State in the first instance, strongly suggested the mother believed the defendant in that case was capable of committing the alleged crime.[63] And in *Ramsey*, there were two mothers assisting in the State's prosecution of the defendant, both of whom clearly believed the defendant was capable of committing the type of sexual crime at issue.[64] Also, in *Ramsey*, although we considered the sufficiency of the evidence for only one sexual abuse conviction, the sufficiency of the evidence supporting another conviction in the case was not challenged.[65] So we reversed the first conviction despite the strong evidence suggesting the defendant was capable of committing the type of crime at issue.[66] Thus the evidence in *Webb* and *Ramsey* regarding what others believed the defendant to be capable of clearly did not take the case outside the ambit of the legal principles discussed in those cases.

¶155 The majority also points to the fact that even in E.D.'s trial testimony, Mr. Stricklan was placed at the scene of the alleged crime. But so were the defendants in *Webb* and *Ramsey*. In *Webb*, the alleged sexual abuse took place during a time in which the defendant "had sole custody" of the child-victim.[67] And in *Ramsey*, the alleged sexual abuse occurred during the two alleged victims' visitation time with their defendant father.[68] So in both cases, the uncontested facts placed the defendants at the scene of the alleged crime.

¶156 What's more, in *Webb* and *Ramsey* there was evidence that a crime had actually taken place. In *Webb*, the jury viewed a photograph of an injury to the victim's anus, the mother testified that she discovered the injury soon after the defendant had been alone with the victim, and a physician shared the opinion, based on

---

[63] 779 P.2d at 1113.

[64] 782 P.2d at 482.

[65] *Id.*

[66] *Id.* at 484.

[67] 779 P.2d at 1109.

[68] 782 P.2d at 482.

the nature of the injury, that the child had been sexually abused.[69] In *Ramsey*, "a licensed social worker" opined, after interviewing the two children-victims, that both children had been sexually abused and "that the perpetrator of the abuse was defendant."[70] And "a psychologist who treated both children, testified that both children fit a profile of sexually abused children and that in her opinion defendant had committed the abuse."[71] So the additional evidence in *Webb* and *Ramsey* was more abundant than it is in this case—which lacks any physical evidence or expert testimony suggesting that E.D. was sexually abused.

¶157 But despite the ample additional evidence in *Webb* and *Ramsey*, we nevertheless took it upon ourselves to weigh the reliability and probative value of the hearsay statements at issue. We did so because, even though the other evidence could be interpreted in a way that was consistent with the content of the hearsay statements at issue, we recognized that key elements of the alleged crimes could not be proven without inclusion of the hearsay statement.

¶158 So, contrary to what the majority states, this case does not fall outside *Webb* and *Ramsey*'s ambit just because the State provided some evidence in addition to the pivotal hearsay statement. Rather, the principles articulated in those cases apply any time hearsay evidence is presented. And under those principles, where the unreliability or inadequate probative value of a hearsay statement leads us to conclude that the evidence is insufficient to establish guilt beyond a reasonable doubt, we must reverse the conviction.[72]

¶159 The majority's misreading of our decisions in *Webb* and *Ramsey* appears to stem, at least in part, from the its misinterpretation of a single sentence—"[t]he law is that a single

---

[69] 779 P.2d at 1109.

[70] 782 P.2d at 482.

[71] *Id.*

[72] Under my approach, which is the approach we followed in *Webb* and *Ramsey*, we can and should consider all evidence that was presented to the jury. So the only difference between my approach and the approach adopted by the majority in this case is that, under my approach, we need not blind ourselves to the inherent unreliability of hearsay evidence when conducting our review.

uncorroborated hearsay statement is not substantial evidence and not sufficient to support a verdict."[73] This sentence appeared in *Webb* and was later repeated in *Ramsey*. As discussed above, the majority takes this to mean that *Webb* and *Ramsey* do not apply where there is other evidence that can be interpreted to corroborate the defendant's guilt. And its analysis suggests that so long as other evidence can be interpreted consistent with the facts alleged in the hearsay statement, the guilt has been "corroborated," and we should not weigh the reliability of the hearsay statement on appeal. But as the discussion above demonstrates, the majority's reading of the opinions in *Webb* and *Ramsey* is inconsistent with the decisions reached in those cases.

¶160 The majority provides no real pushback against this. It cannot argue that the *Webb* and *Ramsey* rule, as it interprets it, is inconsistent with what the courts in *Webb* and *Ramsey did*.[74] Instead the majority argues only that my interpretation conflicts with what it believes the courts in *Webb* and *Ramsey said*. But I don't agree with the majority's interpretation of what the courts in *Webb* and *Ramsey* meant by the sentence in question. The majority interprets the sentence in isolation to mean that the *Webb* and *Ramsey* rule does not apply where there is any evidence beyond a recanted hearsay statement.

¶161 But one of our most firmly established rules of interpretation is that text must be interpreted in the context of surrounding text. This rule applies equally well when we are interpreting a line from one of our previous opinions. And when we consider the *Webb* court's statement that "[t]he law is that a single uncorroborated hearsay statement is not substantial evidence and not sufficient to support a verdict" in context with the rest of the opinion, it is clear that my interpretation is consistent with what the courts in *Webb* and *Ramsey* said and with what they did. The majority's interpretation is not.

¶162 The majority interprets the term "uncorroborated," as it appears in that sentence, to mean a lack of other evidence that can be interpreted consistent with a guilty verdict. I, on the other hand, interpret it to mean a lack of evidence to strengthen the reliability of

---

[73] *Webb*, 779 P.2d at 1115.

[74] *See supra* ¶ 72 (acknowledging my interpretation of *Webb* without disputing that that is what *Webb* does, but nevertheless insisting that "that is not what *Webb* says").

the hearsay statement.[75] In isolation, either of our interpretations of the term "uncorroborated" may be plausible. But the majority makes no attempt to explain why it believes this term could not mean what I interpret it to mean. Rather, the majority's only response to my proposed interpretation of the sentence is to simply state that this is not what *Webb* says.[76] I disagree.

¶163   A review of the entire *Webb* opinion reveals that the court in *Webb* was grappling with how to deal with hearsay evidence that had been admitted through what was, at the time, a new exception to the hearsay rule (an exception for victims of child sex abuse).[77]

---

[75] The majority treats evidence that can be interpreted in a manner consistent with a guilty verdict as though it has corroborated the guilty verdict. But as the Montana Supreme Court recognized in *Giant*, and as we recognized in *Webb* and *Ramsey*, the existence of other evidence that can be interpreted consistent with a guilty verdict is not enough to constitute sufficient "corroboration." Instead, the corroborating evidence must provide an independent indication of the hearsay statement's reliability. *Cf. State v. Gardner*, 27 P.2d 51, 52 (Utah 1933) ("A conviction shall not be had on the testimony of an accomplice, unless he is *corroborated* by other evidence *which in itself*, and *without the aid of the testimony of the accomplice*, *tends to connect the defendant with the commission of the offense*; and the corroboration shall not be sufficient if it merely shows the commission of the offense or the circumstances thereof." (emphases added) (internal quotation marks omitted)).

[76] *Supra* ¶ 72 ("Even if that were what *Webb* does, that is not what *Webb* says."). The majority also claims that my interpretation of *Webb* and *Ramsey* is inconsistent with an interpretation of those cases included in a footnote of our opinion in *State v. Span*. *See supra* ¶ 73 (citing *State v. Span*, 819 P.2d 329, 333 n.2 (Utah 1991)). But the *Span* footnote does not contradict my reading of *Webb* and *Ramsey*, because the additional evidence identified by the *Span* court corroborated the hearsay statement at issue by strengthening the statement's reliability. In other words, it bolstered the reliability of the hearsay statement at issue. So the *Span* footnote is consistent with my reading.

[77] *See Webb*, 779 P.2d at 1110 ("Admission of hearsay statements by child sexual abuse victims is relatively new to our law. Until the enactment of section 76–5–410, which effectively made it impossible to challenge the competency to testify of a child sexual abuse victim,

(continued ...)

And it reveals that the *Webb* court was relying on the Sixth Circuit's decision in *Orrico*—a case that "revolves around the questionable reliability of [hearsay] statements"[78]—when it wrote the sentence in question.[79] And it reveals that the *Webb* court analyzed a significant amount of other evidence—evidence that could be construed as consistent with the jury's guilty verdict but which did not strengthen the reliability of the pivotal hearsay statement—before ruling that the hearsay statement in the case was uncorroborated. So, when we consider the *Webb* court's use of the term "uncorroborated" in context, it is clear that the court used it in the sense I have indicated.

¶164 So, with this context in mind, the correct reading of the statement "that a single uncorroborated hearsay statement is not substantial evidence and not sufficient to support a verdict" is that, due to the inherently unreliable nature of hearsay statements, we can affirm a guilty verdict based primarily on hearsay only if the reliability of the hearsay statement has been corroborated (or bolstered) through other evidence. In other words, where a conviction is based entirely or "almost entirely" on hearsay evidence, we should determine whether other evidence, which "differs from" the hearsay, "strengthens or confirms" what the hearsay evidence shows.[80]

¶165 In sum, our decisions in *Webb* and *Ramsey* establish the following principles: (1) appellate courts may weigh the reliability and probative value of hearsay statements; (2) where a conviction is based almost entirely on an unreliable hearsay statement, the evidence is insufficient to sustain the conviction; and (3) although, as a general matter, hearsay is inherently unreliable, hearsay evidence may be sufficient to support a conviction where other, corroborating evidence provides adequate assurance of the hearsay's reliability. After applying these principles in this case, I conclude that E.D.'s

---

it was almost certain that the testimony of a child as young as the victim here would not be admissible.")

[78] *Giant*, 37 P.3d at 56 (Mont. 2001) (describing the analysis in *Orrico*).

[79] *Webb*, 779 P.2d at 1115 (citing *Orrico*, 559 F.2d at 118).

[80] *Corroborating Evidence*, BLACK'S LAW DICTIONARY (11th ed. 2019).

out-of–court statement is too unreliable to serve as the basis for Mr. Stricklan's conviction.

### B. Because E.D.'s Hearsay Statement is Uncorroborated, the Evidence is Insufficient to Support Mr. Stricklan's Conviction

¶166    The majority's misreading of our decisions in *Webb* and *Ramsey* leads it to incorrectly conclude that the evidence in this case is sufficient to establish the elements of sexual abuse of a child. To prove sexual abuse of a child, the State must establish that the defendant (1) "touche[d] the anus, buttocks, pubic area or genitalia of any child, [or] the breast of a female child" and that he did so with the "intent to cause substantial emotional or bodily pain to any individual or with the intent to arouse or gratify the sexual desire of any individual."[81] The majority concludes the State presented sufficient evidence to satisfy either of these elements. But this conclusion appears to stem from the majority's view that it cannot make its own assessment of the evidentiary weight of E.D.'s hearsay statement.[82]

¶167    The majority characterizes this case as a choice between two versions of events.[83] In one version, Mr. Stricklan entered E.D.'s bedroom after she had gone to bed and began groping E.D.'s breasts and buttocks.[84] In the other version, nothing criminal occurred. E.D.,

---

[81] UTAH CODE § 76-5-404.1(2).

[82] The majority argues that this overstates its position. Instead, the majority would like its position to be described as an acknowledgement "that, when an assessment of credibility turns on observing a witness and her demeanor, we afford deference to the trier of fact that had the opportunity to assess the witness's credibility." *Supra* ¶ 100 n.18. But no trial witness in this case testified to facts that could sustain a conviction. The majority cannot credibly argue otherwise. So the question in this case is whether E.D.'s hearsay statement, which was repeatedly recanted at trial, is sufficiently reliable to sustain a conviction. I say it is not, but the majority argues that this is an improper re-weighing of the evidence. With this in mind it is difficult to characterize the majority's position as anything but a rejection of the principle that we are permitted to weigh the evidentiary weight of hearsay statements on appeal.

[83] *Supra* ¶ 2.

[84] *Supra* ¶ 111.

who liked to sleep with a lamp and a television on, awoke because the noise of the television had been turned off. Upon waking, she saw Mr. Stricklan passed out on her floor. E.D. ran to her mother's room to tell her mother what had happened. But, either because she had dreamed it or thought it while "half awake," she told her mother some "crazy and untrue stuff" about Mr. Stricklan touching her. And later, after the police had been called, E.D. stuck to her claim about Mr. Stricklan touching her because she was afraid that she and her mother would get into trouble if she admitted to lying about Mr. Stricklan touching her. Those are the two versions of events described by the majority.

¶168   But the jury never heard the first version. The jury never heard E.D. claim that Mr. Stricklan entered her bedroom in order to sexually abuse her. Instead, the jury heard E.D. recount the second version in detail—a version in which no criminal activity occurred. And it heard E.D. admit, after questioning from the State, that she had previously claimed that Mr. Stricklan had at some point touched her "boobs" and her "bottom." But in the same breath in which E.D. admitted to having previously claimed this, the jury also heard E.D. vehemently deny that it was in fact true. And although E.D. admitted to having made this claim, she provided no additional details for how the previously alleged touching had taken place or even when it had happened. So the jury never heard a version of events similar to what the majority describes.

¶169   And, unlike the evidence presented in *Webb* and *Ramsey*, there is no physical evidence of sexual abuse in this case. Also unlike those cases, there is no expert testimony opining that the alleged victim has been abused. Nor are there any witnesses who testified, under oath, that they believed sexual abuse occurred or that Mr. Stricklan committed the crime. And in contrast to the facts in *Webb*, the person who made the previous out-of-court statement in this case unequivocally refuted the truthfulness of that statement at trial.

¶170   So the evidence in support of Mr. Stricklan's conviction amounts to a *reference* to an out-of-court statement in which E.D. claimed that Mr. Stricklan touched her "boobs" and her "bottom" and to testimony regarding how others reacted to this claim.[85] But

---

[85] The majority argues that to "characterize E.D.'s testimony as a 'reference' ignores the reality of what the State presented to the

(continued ...)

none of this other evidence strengthens the likelihood that E.D.'s out-of-court claims were true. In other words, it does not render E.D.'s hearsay statement more reliable. Rather, this evidence shows only that other people believed E.D.'s claims. In contrast to the majority, I conclude this is insufficient to prove beyond a reasonable doubt that Mr. Stricklan committed the crime of sexual abuse of a child.

¶171   As the majority correctly notes, our task on appeal is to review the evidence presented to the jury and to determine whether reasonable jurors "must have entertained a reasonable doubt that the defendant committed the crime for which [the defendant] was convicted."[86] Although it is unnecessary to repeat all the facts set forth by the majority, it is important to emphasize that the evidence

---

jury." *Supra* ¶ 116. I disagree. Although the State questioned E.D. at length about her previous claim that Mr. Stricklan had touched her "boobs" and her "bottom," this questioning did not lead to any additional detail about the alleged crime. So E.D.'s bare admission that she had previously made such a claim, without any additional factual detail, may aptly be described as a reference to an out-of-court statement.

The majority also suggests that evidence about how others reacted to E.D.'s claim could render E.D.'s claim more reliable. And, as an example, it argues that "an unqualified confession" by a defendant could be characterized as having been made in reaction to a hearsay statement. *Supra* ¶ 84 n.14. But an unqualified confession, in which a defendant relies on his or her personal knowledge to confirm the facts contained in another witness's statement, is not evidence regarding "how others reacted" to a hearsay statement. Rather, an unqualified confession would provide "independent" corroboration of the facts contained in the hearsay statement. *Compare Gardner*, 27 P.2d at 52 (explaining that corroborative evidence had to provide support for the facts needing corroboration "without the aid" of the facts to be corroborated) *with id.* (concluding that certain evidence was insufficient to corroborate other evidence because "[t]here [was] no corroborative evidence *independent* of the statements which it is claimed appellant made to others after the crime was committed which tends to implicate him in the commission of the crime." (emphasis added)).

[86] *State v. Robbins*, 2009 UT 23, ¶ 14, 210 P.3d 288 (internal quotation marks omitted).

supporting Mr. Stricklan's conviction amounts to nothing more than an out-of-court statement, which was repeatedly and strenuously recanted at trial, and witness testimony regarding how people reacted to this out-of-court statement before it was recanted. In short, the State's case rests almost entirely on the reliability of an out-of-court statement, the truth of which was clearly denied under oath. With these facts in mind, it is difficult to see how any reasonable juror would not have entertained a reasonable doubt regarding Mr. Stricklan's guilt.

¶172 The majority, of course, disagrees. But in so doing, the majority does not attempt to weigh the reliability of E.D.'s hearsay statement. Instead, it argues that this case comes down to a question about which version of E.D.'s story the jury believed.[87] And because

---

[87] *Supra* ¶ 2. Because, at trial, the only witnesses who would have personal knowledge of the alleged incident (including the alleged victim) agreed that no crime was committed, the jury was never presented with two different versions of events. The majority's contrary characterization of the case fails. *Supra* ¶ 100. The majority is correct that the jury heard evidence that Mr. Stricklan was unsure why E.D. said what she said and that he did not think she would just make something up. (The majority relies heavily on this latter bit of evidence, characterizing it as though Mr. Stricklan had all but confessed to the crime. But, in context, it appears that all Mr. Stricklan meant when he said he did not think E.D. was making it up was that he did not think she was intentionally lying.) But the jury would have been well-aware that Mr. Stricklan denied committing the crime charged. It was, after all, Mr. Stricklan's not-guilty plea that made the jury's presence at the trial necessary. And the jury heard Mr. Stricklan, through his attorney, mount a vigorous defense against this charge. So there could be no doubt that Mr. Stricklan denied committing the crime for which he was accused.

The majority's characterization of E.D.'s position is likewise flawed. Although the State managed to admit references to E.D.'s previous (but recanted) allegations, E.D. told the jury that her previous allegation was "a lie," that Mr. Stricklan never touched her, and that she was one "hundred percent sure" and had "no doubt" in her mind that Mr. Stricklan never touched her. She also repeatedly answered that she understood the importance of telling the truth

(continued ...)

the jury apparently found the reference to E.D.'s out-of-court statement to be more "credible" than her trial testimony, the majority declines to second-guess the conviction.

¶173 But E.D.'s previous claim that Mr. Stricklan sexually abused her was not made before the jury, so the jury was not in a position to judge E.D.'s credibility while E.D. made it. That is one of the chief problems with hearsay statements (and with the majority's failure to correctly apply the principles established in *Webb* and *Ramsey*)—with hearsay, the fact finder has no opportunity to observe the witness's demeanor and assess the witness's credibility while the witness is making the out-of-court statement.[88] So the evidentiary sufficiency of this hearsay claim does not come down to the claim's *credibility*, as the majority suggests.[89] Rather, as our holdings in *Webb*

---

under oath and that no one threatened her or urged her to say what she was saying at trial.

[88] *State v. Clevenger*, 289 S.W.3d 626, 629 (Mo. Ct. App. 2009) ("Courts also generally exclude hearsay evidence as inherently unreliable because the out-of-court statements cannot be cross-examined, and *neither the judge nor jury is able to assess the declarant's demeanor in determining witness credibility*." (emphasis added)); *cf. Sinning v. State*, 172 P.3d 388, 392 (Wyo. 2007) ("Where *non-hearsay* is presented, we defer to the district court's opportunity to assess the credibility of the witnesses and make necessary inferences, deductions and conclusions." (emphasis added)).

[89] The majority responds to this point by stating that because the jury saw "the prosecutor question E.D. about her previous statements" and heard "E.D.'s trial testimony that [Mr.] Stricklan did not touch her" as well as "the testimony of other witnesses," the "jury was in the best position to weigh all the evidence and determine the credibility of that evidence." *Supra* ¶ 117. But this argument again fails to fully account for the inherently unreliable nature of hearsay statements. It fails to account for the fact that a "hearsay statement can never be subjected to the same degree of scrutiny through cross-examination as can live testimony." Goldman, *supra* ¶ 140. And it fails to account for the fact that an "opponent may never be able to expose, and the trier of fact never learn, the possible reliability problems of a given hearsay statement," even where "the declarant takes the witness stand and relates his or her own prior out-of-court statement." *Id.; see also Giant,* 37 P.3d at 59 (discussing reasoning similar to that employed by the majority

(continued ...)

and *Ramsey* make clear, the outcome of this case comes down to the evidentiary *weight* we assign E.D.'s recanted, unsworn, out-of-court statement, based on its *reliability*, when that statement is considered together with all the evidence presented to the jury.

¶174 It is possible, of course, that in a future case a hearsay statement could possess sufficient indicia of reliability to stand on equal evidentiary ground as an in-court statement made under oath. But in this case the only evidence cited by the State or the majority does not bolster the reliability of the hearsay statement, because the evidence is equally susceptible to an interpretation wholly consistent with E.D.'s trial testimony. In other words, none of the other evidence in this case corroborates E.D.'s hearsay statement.

¶175 For example, the majority points out that E.D.'s mother asked Mr. Stricklan about E.D.'s allegations and that her mother had been crying when the police arrived.[90] But only a very irresponsible mother would ignore an allegation, made by her daughter, of this nature. In fact, out of an abundance of caution, a mother is likely to investigate such an allegation even if she suspects it might not be true. And the fact that the mother was crying when the police

---

before explaining that "this rationale only addresses the credibility a jury gives to one witness. It does not address whether the out-of-court statement is so reliable it supports guilt beyond a reasonable doubt").

The majority's reference to other witnesses is also misplaced in this case because no other witness could testify to the truth of any facts contained in E.D.'s hearsay statements or provide any other information that would support a conviction. So their testimony could not have provided the jury with any corroboration of the information in E.D.'s hearsay statements. *See, e.g., Walton v. State*, 88 Ind. 9, 19 (1882) ("It is wholly immaterial whether some other witness would or would not believe the particular witness under oath.").

[90] *Supra* ¶ 86. The majority actually describes this encounter as a confrontation. *Supra* ¶¶ 7, 84. And in so doing, it suggests the mother came to Mr. Stricklan fully believing what E.D. had told her. But a review of the trial transcript shows that although the State described this encounter as a confrontation in opening and closing arguments, the evidence actually presented to the jury describes the encounter in more neutral terms.

arrived is not inconsistent with E.D.'s in-court recantation because, at the time the police arrived, E.D. had not yet recanted.

¶176   The majority also relies on the fact that Mr. Stricklan told the police that E.D. did not have a reputation for lying.[91] But the fact remains that E.D. was not entirely truthful at least once in this case: either in her out-of-court statement or under oath at trial. So, based on this evidence regarding her reputation for honesty, it seems at least equally likely that her out-of-court statement, which she claims was the result of a false impression she received while "half awake," contains the falsehood rather than her sworn statements in court.

¶177   The majority also points to the fact that E.D. was sad in the aftermath of her having made the allegations against Mr. Stricklan.[92] According to the majority, this suggests that E.D. had a motive to recant her allegations, even if they were true. That's possible. But her sadness would also provide her with an added incentive to recant false allegations, even if she thought she (or her mother) could get in trouble for doing so. And, under oath, E.D. swore that she was never coerced or pressured to recant her testimony. So this evidence, like all the evidence the majority cites, is consistent with either version of events. So it does not provide us with any added assurance that E.D.'s hearsay statement is reliable.[93]

---

[91] *Supra* ¶ 89.

[92] *Supra* ¶ 90.

[93] The majority criticizes me for offering plausible alternative explanations for this other evidence. *Supra* ¶ 118-19. It states that it is "of no moment that we can offer alternative explanations, or even that we would have reached a different conclusion had we served on the jury" because the "question [before us] is whether enough evidence existed to permit the jury to reach its verdict." *Supra* ¶ 119. But the majority misreads my opinion. I am not reviewing this other evidence to determine whether it could support an alternative, plausible conclusion. This is because none of this evidence speaks directly to the elements of the crime in this case. Instead, I am examining this evidence to determine whether it bolsters (or corroborates) the reliability of E.D.'s out-of-court statements (the only piece of evidence that speaks to any elements of the crime at issue). And, as *Webb* and *Ramsey* make clear, this reliability assessment does not require me to defer to the jury. Because I conclude that the hearsay statement is unreliable, and that none of

(continued ...)

¶178 The closest the majority comes to identifying evidence that could bolster the reliability of E.D.'s hearsay statement is when it points to a statement one police officer claimed to have overheard Mr. Stricklan make.[94] The officer testified he overheard Mr. Stricklan tell someone on the phone that he had acted inappropriately. And the majority notes that this officer wrote down the statement "verbatim into [his] report."[95] If true, this evidence could provide an independent indication that E.D.'s hearsay statement was true. But Mr. Stricklan's father, who was the person on the other end of the phone call, testified that Mr. Stricklan told him only that he had been "accused" of doing something inappropriate, not that he had done something inappropriate.[96] In addition, the officer's testimony—that he wrote the statement down "verbatim"—merely suggests that the officer did not misremember what he *thought* he heard. It does not tell us whether he misheard Mr. Stricklan's statement in the first instance.

¶179 But even were we to disregard this conflicting evidence and accept the officer's testimony as true, this statement does not necessarily corroborate E.D.'s hearsay statement. The phrase "I did something inappropriate" is ambiguous. And, under the circumstances, it is quite possible that this phrase referred to Mr. Stricklan's excessive drinking the night before. The jury heard that the night of the alleged incident Mr. Stricklan drank "a 6-pack of Bud Light Tall Boys," "some vodka," a "Pabst beer," and "a whole

---

the other evidence bolsters its reliability, I answer the ultimate question in this case in the negative. I conclude that the evidence presented by the State is insufficient to support a guilty verdict.

I also note that under our case law "[c]orroborative evidence must be inconsistent with innocence and is not sufficient if it merely casts a grave suspicion on the accused." *Gardner*, 27 P.2d at 52. So the majority's treatment of the other evidence in this case as though it corroborates E.D.'s hearsay statement is inconsistent with our case law.

[94] *Supra* ¶ 88.

[95] *Supra* ¶ 88.

[96] The father was asked, "on a scale of 1 to 10, 10 being absolutely positive" how certain he was that Mr. Stricklan had said he was "accused" of doing something inappropriate, not that he had done something inappropriate. The father replied "Eleven."

bottle of wine." In fact, the jury heard that Mr. Stricklan drank so much alcohol that he passed out and did not remember anything else until morning. The jury also heard Mr. Stricklan's father testify that "drinking" had "been an issue" for Mr. Stricklan "ever since he got back from the wars." And the jury heard his father testify that he could discern over the phone, based on the sound of Mr. Stricklan's voice, that Mr. Stricklan had been drinking too much. And, finally, the jury heard that Mr. Stricklan had been attending AA meetings since the day of the alleged incident.

¶180 Based on this contextual evidence, it is reasonable to assume that, when Mr. Stricklan called his father to ask for a ride because he was too drunk to drive himself, Mr. Stricklan's reference to inappropriate acts was a reference to his excessive drinking and not to any acts of sexual abuse. Accordingly, this evidence is consistent with either version of events and does not bolster the reliability of E.D.'s hearsay statement.

¶181 In sum, when all the evidence in this case is considered, it's clear that, like the convictions we reversed in *Webb* and *Ramsey*, Mr. Stricklan's conviction is based "almost entirely on one out-of-court declaration" of a child.[97] And, as in *Webb* and *Ramsey*, there is no evidence in this case to sufficiently corroborate this hearsay statement. In fact, the truth of the hearsay statement in this case is even less reliable than in *Webb* or *Ramsey* because E.D., the child who made the initial out-of-court statement, unequivocally refuted the truth of her initial statement.[98] Accordingly, Mr. Stricklan's

---

[97] *Webb*, 779 P.2d at 1115.

[98] In this case, E.D. repeatedly denied the truth of her out-of-court statement. In fact, she testified she was one "hundred percent sure" and had "no doubt" in her mind that Mr. Stricklan did not touch her. In contrast, in *Webb*, the child-declarant was only eighteen-months old and, as a result, was not required to testify in court about her hearsay statement. *Webb*, 779 P.2d at 1108. And in *Ramsey*, although the child-declarant did deny "the factual assertion contained in the statement," there was no indication in the opinion that he denied it in such unequivocal terms. *Ramsey*, 782 P.2d at 483. And the child's denial was undercut slightly by the fact that, at one point, the child testified that his defendant-father had "threatened" to "hurt" the child if the child "told on him." *Id.* at 487 (Hall, C.J., concurring and dissenting).

conviction is "not based on substantial reliable evidence" and, therefore, under the principles we discussed in *Webb* and *Ramsey*, it "cannot stand."[99] For this reason, the majority errs in affirming the conviction.

## II. Even Were We to Deem E.D.'S Hearsay Statement Sufficiently Reliable to Support a Finding That Mr. Stricklan Touched E.D.'S Breasts or Buttocks, It Would Nevertheless Be Insufficient to Show That Mr. Stricklan Touched E.D. With the Requisite Intent

¶182 Even were we to deem E.D.'s hearsay statement sufficiently reliable to support a finding that Mr. Stricklan touched E.D.'s breasts or buttocks, I would nevertheless conclude that the evidence is insufficient to show that Mr. Stricklan touched E.D. with the requisite intent. The majority acknowledges that there is no direct evidence of Mr. Stricklan's intent when he allegedly touched E.D. But it notes, correctly, that "criminal intent" may "be inferred from circumstances such as presence, companionship, and conduct before and after the offense."[100] But this case does not present sufficient circumstantial evidence of intent.

¶183 As discussed above, the jury did not hear evidence that Mr. Stricklan touched E.D.'s breasts and buttocks within the context of a recounted version of events. It heard E.D. convey a story in which no criminal activity occurred, but where she awoke to find Mr. Stricklan passed out on her bedroom floor. And then they heard E.D. admit, in response to State questioning, that she had previously claimed that Mr. Stricklan touched her "boobs" and "bottom." This reference to a hearsay allegation, presented in the abstract, is insufficient to sustain a finding of intent. And the majority's conclusion to the contrary will render the intent element superfluous in most cases.

¶184 In support of its reasoning, the majority cites a number of court of appeals cases in which that court found there to be sufficient evidence of intent despite any direct evidence.[101] But in all the cases

---

[99] *Id.*, 782 P.2d at 483.

[100] *Supra* ¶ 106 (*citing State v. Briggs*, 2008 UT 75, ¶ 13, 197 P.3d 628) (internal quotations omitted).

[101] *Supra* ¶¶ 107-09.

cited by the majority, the circumstantial evidence was so overwhelming that no other conclusion could possibly be drawn.[102]

---

[102] *See State in Interest of D.M.*, 2013 UT App 220, ¶ 11, 310 P.3d 741 (finding circumstantial evidence of intent where the defendant pulled down the victim's pants and touched his testicles while the two of them were underneath a futon during a sleepover and where the victim testified to feeling "scared" as a result); *State v. Bair*, 2012 UT App 106, ¶ 6, 275 P.3d 1050 (finding circumstantial evidence of intent where the defendant admitted to having an "addiction to the 'touchy/feely' aspects of sex that he admittedly was having difficulty controlling not long before [the victim-daughter] was abused" and where the daughter's testimony regarding the acts of abuse were "consistent" with the nature of the defendant's addiction); *State v. Bhag Singh*, 2011 UT App 396, ¶ 9, 267 P.3d 281 (finding circumstantial evidence of intent where the defendant moved closer to the eleven-year-old victim as he told her that "he liked her and loved her," "rubbed her breasts approximately three times in an up and down motion," and "leaned in and kissed" her); *State v. Watkins*, 2011 UT App 96, ¶ 18, 250 P.3d 1019 (finding circumstantial evidence of intent where the defendant had "no legitimate reason" to be in the "Child's room at the time of the incident," the defendant "kissed [the] Child wetly on the side of her head for approximately three minutes" and "pinched and rubbed her buttocks for approximately two minutes"), *rev'd on other grounds by State v. Watkins*, 2013 UT 28, ¶ 18, 309 P.3d 209; *State v. Maness*, 2010 UT App 370 U, 2010 WL 5452078 (finding evidence of circumstantial intent where, on multiple occasions, the defendant-masseuse entered a massage room early, moved a concealing drape to expose the victims' naked bodies, touched the victims' genitalia and breasts "during a massage procedure that should be performed without touching the genitalia," and lingering after administering a massage); *State v. Tueller*, 2001 UT App 317, ¶ 19, 37 P.3d 1180 (finding circumstantial evidence of intent where the defendant was discovered lying on top of the child-victim in a darkened room and, at the time of discovery, the defendant had his pants pulled down to the "the bottom margin of his buttocks," the child's "panties were down near her knees," and her "legs were spread apart" with the defendant's knee in between them); *State v. Hall*, 946 P.2d 712, 724 (Utah Ct. App. 1997) (finding circumstantial evidence of intent

(continued ...)

¶185   In fact, in one case the majority cites, the court of appeals reversed a conviction based on insufficient evidence of intent. In that case, a defendant was convicted of sexual abuse of a child based on the physical act of moving the child's "hand—palm up—to Defendant's penis."[103] The defendant, who claimed to have been asleep at the time of the alleged incident, had no memory of the incident.[104] Although there was evidence that the child's hand remained over the defendant's penis for "up to a minute," the State did not present any evidence that the defendant "had held [the alleged victim's] hand in place or otherwise manipulated it."[105] In considering the sufficiency of the defendant's conviction, the court of appeals explained that "the State produced no evidence beyond the physical act [constituting the alleged touching] to satisfy the State's burden of proving beyond a reasonable doubt Defendant's intent to arouse or gratify the sexual desire of himself or any other person."[106]

¶186   In responding to the State's arguments in defense of the evidence, the court explained that the State, which argued (similarly to the majority in this case) that intent could be inferred based on the defendant's act, had essentially asserted "an evidentiary presumption that the physical act of touching amounts to prima facie evidence of an intent to do so for the purpose of arousing or gratifying sexual desire."[107] But, because such a presumption would "effectively and impermissibly shift the burden of proof regarding intent onto the defendant so long as the physical act element is proven," the court of appeals rejected the State's argument.[108]

---

where the "defendant pulled down [the victim's] shorts and panties and stroked her on the genital area").

[103] *State v. Whitaker*, 2016 UT App 104, ¶ 15, 374 P.3d 56.

[104] *Id.* ¶ 16.

[105] *Id.* ¶ 15.

[106] *Id.*

[107] *Id.* ¶ 17.

[108] *Id. See also Francis v. Franklin*, 471 U.S. 307, 313 (1985) ("The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. This bedrock, axiomatic and elementary constitutional

(continued ...)

¶187 Instead, the court considered whether the facts presented led to a reasonable inference of intent. In so doing, the court noted that an alternative explanation could be given for the defendant's act of moving the child's hand—that the defendant acted "involuntarily while asleep."[109] And, because no other circumstantial evidence of intent existed (beyond the physical act of touching), the court explained that it was not reasonable to infer that the act had been done with the requisite criminal intent.[110] According to the court, this would require the court to "take a speculative leap across a remaining gap."[111]

¶188 In my view, the majority has taken this speculative leap in finding the existence of intent. The only evidence presented of the crime was E.D.'s admission that she had previously claimed that Mr. Stricklan touched her "boobs" and "bottom." This admission did not provide any additional details from which we could infer intent. For example, it did not indicate for how long Mr. Stricklan had allegedly touched E.D. And it did not indicate the nature of the touch—whether Mr. Stricklan's hand merely brushed up against her or whether it lingered or stroked her.

¶189 The majority explains that, because Mr. Stricklan allegedly touched E.D. in two places, the touch could not be accidental. But this is not the only interpretation of events consistent with evidence. For example, evidence was presented that Mr. Stricklan thought (although his recollection of events was murky because he was inebriated at the time) that he had gone into E.D.'s bedroom to turn off her lamp and television. So it is possible that in engaging in the paternal act of turning off E.D.'s television or lamp, Mr. Stricklan also decided to tuck E.D. into her bed covers, at which point he inadvertently touched her. Of course, this is highly speculative.[112]

---

principle prohibits the State from using evidentiary presumptions . . . that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." (internal quotation marks omitted)).

[109] *Whitaker*, 2016 UT App 104, ¶ 16.

[110] *Id.* ¶ 18.

[111] *Id.* (internal quotation marks omitted).

[112] Had E.D. been half asleep while this was happening, she could easily have misinterpreted it as something more offensive. It is also

(continued ...)

But this is no more speculative than the alternative reason offered by the court of appeals in *Whitaker*.[113] And, because there is no contextual evidence surrounding E.D.'s recanted allegation that Mr. Stricklan touched her, the majority's adopted inference is just as speculative.

¶190 Finally, the majority explains that the fact that E.D. ran to tell her mother what had happened also suggests the touch was not accidental. But the evidence presented to the jury actually indicates that E.D. ran to tell her mother that Mr. Stricklan was passed out on her bedroom floor, not that Mr. Stricklan had touched her. So even though the record makes it clear that, at some point, E.D. claimed to have been touched by Mr. Stricklan, this hearsay claim was never presented within the factual context necessary to make the type of "reasonable" inferences the majority purports to make. And by ruling as the majority does based on the evidence in the case, the majority creates an evidentiary presumption that the "intent" element is satisfied whenever the "touching" element has also been met. This impermissibly flips the burden of proof of an essential element onto the defendant. Accordingly, the evidence is insufficient to support a finding of guilt on the "intent" element.

¶191 In sum, when the evidence presented to the jury is considered (and only that evidence), it is clear that Mr. Stricklan's conviction is based almost entirely on E.D.'s hearsay statement. Because there is no evidence to bolster the inherent unreliability of this statement (in fact, the sworn in-court statement expressly refutes it), the evidence in the case is insufficient to support Mr. Stricklan's conviction.

¶192 Additionally, even were I to conclude that E.D.'s hearsay statement was sufficiently reliable, I would nevertheless conclude that there is insufficient evidence to prove the "intent" element. Because all the jury heard was a reference to an abstract allegation that Mr. Stricklan had touched E.D.'s breasts and buttocks, any inference about intent in this case is necessarily speculative. And,

---

possible, while moving about her room in his drunken state, that Mr. Stricklan tripped onto E.D.'s bed and touched her inadvertently while attempting to push himself back onto his feet.

[113] *Id.* ¶ 16 (explaining that the defendant could have placed the victim's hand over the defendant's penis "involuntarily while asleep").

were we to conclude that this evidence is sufficient to satisfy the intent element beyond a reasonable doubt, we would render the intent element superfluous in most cases.

## CONCLUSION

¶193   Mr. Stricklan's conviction was based "almost entirely" on E.D.'s out-of-court statement. Because that statement is unreliable, and no evidence presented in the case sufficiently bolsters the statement's reliability, I conclude the evidence is insufficient to sustain Mr. Stricklan's conviction. Additionally, even were I to conclude that E.D.'s hearsay statement was sufficiently reliable, I would nevertheless conclude there is insufficient evidence regarding Mr. Stricklan's intent.

––––––––––––